**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MILTON R. ANDERSON,         ) | |
|           ) | |
|        **Plaintiff,**      ) | |
|           ) | |
|      **v.**           ) | **No. 04 C 3800** |
|           ) | |
| **FOLLETT HIGHER EDUCATION GROUP,**   ) | **Judge Rebecca R. Pallmeyer** |
|           ) | |
|        **Defendant.**     ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Milton Anderson worked for Defendant Follett Higher Education Group ("Follett"), a nationwide operator of campus bookstores, for nineteen years. On September 17, 2002, Follett terminated Anderson from his position as Store Manager at Follett's Chicago State University bookstore. In this lawsuit, Anderson contends that Follett terminated him on the basis of his race and in retaliation for complaints about race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, and 42 U.S.C. § 1981. Follett now moves for summary judgment and, for the reasons presented here, the motion is granted in part and denied in part.

**FACTUAL BACKGROUND**[1]

**I.    Anderson's Employment with Follett**

    **A.    The Parties**

---

[1]    Facts presented here are taken from the parties' Local Rule ("LR") 56.1 statements and attachments. Defendant's Statement of Undisputed Material Facts is cited here as "Def.'s 56.1." Plaintiff's Local Rule 56.1(b)(3) Response to Follett Higher Education Group's 56.1(a)(3) Statement of Undisputed Material Facts is cited here as "Pl.'s 56.1 Resp." Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts is cited here as "Def.'s 56.1 Reply." Plaintiff's Local Rule 56.1(b)(3) Supplemental Statement of Additional Undisputed Material Facts is cited here as "Pl.'s 56.1 Addnl." Defendant's Response to Plaintiff's Supplemental Statement of Additional Undisputed Material Facts is cited here as "Def.'s 56.1 Addnl. Resp."
Follett contends that Anderson's LR 56.1 response and statement of additional facts contain argument, rambling narratives, misleading and inaccurate charts, and irrelevant and unsupported assertions, in violation of LR 56.1. The court agrees that Anderson's *pro se* status does not relieve him of his obligation to comply with this court's rules. *See Moore v. Illinois State Police*, 249 F. Supp. 2d 999, 1001 (N.D. Ill. 2003). The court will disregard those assertions that are immaterial or are unsupported by citation to the record.

Defendant Follett operates college and university bookstores nationwide.  (Def.'s 56.1 ¶ 1.)  Each bookstore has a Store Manager who is responsible for the overall operation of the store.  (*Id.* ¶ 2.)  The Store Manager's duties include, *inter alia*, "driving" store sales, ensuring that customer service standards are met, maintaining store appearance, and ensuring proper accounting of assets, cash and inventory.  (*Id.*)  Store Managers are also responsible for hiring, firing, and disciplining employees.  (*Id.*)  The Store Manager reports to a Regional Manager, who in turn reports to a Group Vice President.  (*Id.*)  Follett transfers Store Managers and other management-level employees locally or throughout the country as they advance within Follett, either as a result of an employee's application for a new position or as business needs dictate.  (*Id.* ¶ 3.)

Follett's bookstores are classified by sales volume as A, B, C, and D stores, with A stores having the highest volume.  (*Id.* ¶ 4.)  Each store's annual budget is based on the store's performance the previous year, marketing assumptions, and factors unique to the store's campus.  (*Id.* ¶ 5.)  Follett asserts that the Store Manager, Regional Manager, and Vice President collectively determine the store's budget each year.[2]  (*Id.*)

Follett conducts yearly performance appraisals for its Store Managers.  Prior to 2000, managers were rated in four categories: "People First" (evaluating interpersonal skills); "Managerial/Professional" (evaluating the manager's ability to manage the store in a professional manner); "Objectives" (evaluating whether the manager met objectives from the last review); and "Financial Soundness/Accountabilities" (evaluating the store's profitability, performance to budget, and level of "shrink"[3]).  (*Id.* ¶¶ 12-16.)  At some point in 2000, the "Objectives" category was eliminated, (*id.* ¶ 12), although it appears to have been reinstated in 2002.  (2002 Performance

---

[2]     Anderson disputes this assertion by citing to his own affidavit, which states that he had no input in the budgeting process when he was a Store Manager.  (Pl.'s 56.1 Resp. ¶ 5; Anderson Supp. Aff. ¶ 1, Ex. Q to Pl.'s 56.1 Addnl.)  This dispute is immaterial.

[3]     "Shrink" is the difference between actual inventory and inventory on the books, usually due to lost or stolen merchandise.  (Def.'s 56.1 ¶ 16; Pl.'s 56.1 Addnl. ¶ 4.)

Appraisal, Ex. S to Appendix in Support of Defendant's Motion for Summary Judgment ("Appx.").) Within each category, managers are given a score of 1 through 5 for specific criteria, with 1 being the lowest rating, and an overall score for the category itself. (Def.'s 56.1 ¶ 17.) The overall performance rating is obtained by averaging the categories. (*Id.*) A rating of 4.6–5.0 is "Exceptional", 3.6–4.5 is "Above Standard", 2.6–3.5 is "Standard", 1.6–2.5 is "Below Standard", and 0–1.5 is "Unsatisfactory".[4] (*Id.* ¶ 18.) According to Follett, the overall rating is used to determine a manager's eligibility for a salary increase; managers may also be eligible for a bonus based on profitability factors.[5] (*Id.* ¶ 19.)

Anderson, a black male, began working for Follett in August 1983 as a temporary clerk in the shipping and receiving department at the University of Illinois, Champaign-Urbana bookstore. (*Id.* ¶ 6.) He held a variety of staff and management positions within Follett, (*id.*), including the position of Store Manager at three campus bookstores: the Roosevelt University ("Roosevelt") store from December 1994 to October 1996, (*id.* ¶¶ 20, 23); the Virginia State University ("Virginia State") store from October 1996 to May 2000, (*id.* ¶¶ 23, 38); and the Chicago State University ("Chicago State") store from May 2000 until his termination on September 17, 2002. (*Id.* ¶¶ 38, 62.)

---

[4]     In her deposition, Follett Director of Employee Relations Paula Zawojski testified that "up to a 2.7 is considered below standard. 2.7 and above up to 3.6 is considered standard." (Zawojski Dep., Ex. A to Supplemental Appendix in Support of Defendant's Motion for Summary Judgment ("Supp. Appx."), at 44.) Her affidavit defines "standard" as 2.6 to 3.5, (Zawojski Aff. ¶ 8), and the appraisals themselves indicate that 2.6 to 3.5 is the "standard" range. (1999 Performance Appraisal, Ex. O to Appx.; 2000 Performance Appraisal, Ex. P to Appx.)

[5]     Anderson contends that "overall rating is not the only factor in setting salary increases." (Pl.'s 56.1 Resp. ¶ 19.) He includes, in his LR 56.1 response, a chart labeled "Merit Increase Guidelines" that ties ratings ranges to a percentage range of salary increases; this is followed by charts providing salary and store profit information for several Follett managers, who, he contends, received "subjective and random" raises outside those guidelines. Anderson further cites the fact that he received a 3.5% raise in 2001, despite a below-standard appraisal rating of 1.98 in July of that year. (*Id.* ¶¶ 19, 50.) Although this evidence may suggest that Follett considered additional factors when setting salary increases, it does not contradict Follett's assertion that performance ratings were indeed a factor.

Anderson received annual wage increases throughout his employment,[6] and each time he was transferred from one location to another, it was either a lateral move with the same or better pay, or a promotion with a salary increase.  (*Id.* ¶¶ 7, 8.)  Anderson never was denied a position within Follett for which he applied.  (*Id.* ¶ 9.)

Follett asserts that it has "long-standing anti-discrimination and anti-harassment policies that encourage employees to report claims of discrimination and harassment to management or to the Human Resources Department," and that Anderson was aware of such policies.  (*Id.* ¶ 10.)  Anderson disputes this, claiming that he was unaware of "any discrimination or harassment policy," and had never received any documentation or handbook regarding such policies.  (Pl.'s 56.1 Resp. ¶ 10.)  In his deposition, Anderson testified that he never received a handbook while working for Follett, but that he had received a "Code of Conduct" containing (unidentified) human resources policies.  (Pl.'s Dep., at 19-20.)  He further acknowledged that he became aware that Follett had an anti-harassment or anti-discrimination policy "at some point during [his] employment."  (*Id.* at 21.)  Although Follett attaches a copy of policies relating to discrimination and harassment to the affidavit of Director of Employee Relations Zawojski,[7] (Ex. 1 to Zawojski Aff., Ex. F to Appx.), and Zawojski indeed states that the policies are "long-standing," (Zawojski Aff. ¶ 6), Follett does not indicate when such policies went into effect, or how they are distributed to employees.

Follett also maintains a confidential reporting and investigation program called "MR. HEAT," which provides a toll-free number to an internal auditing agency.  (Def.'s 56.1 ¶ 11.)  Follett asserts

---

[6]     Anderson, in his LR 56.1 response to Follett's statement of facts, asserts that he did not receive raises in 1984, 1985, 1986, and 2002.  (Pl.'s 56.1 Resp. ¶ 7.)  He testified in his deposition, however, to receiving raises in 1984 and 1986, (Pl.'s Dep., Ex. A to Appx., at 16, 33), and his termination in 2002 likely precluded any raise that year.  The fact that he may not have received a raise in 1985 is not material here.

[7]     The court has denied Anderson's motion to strike Zawojski's affidavit, but will consider Anderson's objections to specific statements therein, where appropriate.  *See* Order of 3/30/2007.

that the program "encourages employees to make confidential complaints of discrimination (or any other improper management conduct)," (*id.*), but the program description (on a Follett web page titled "Policies—Workplace—Complaint Procedures") makes no explicit reference to discrimination. According to this description, "HEAT" stands for "Honest Employees Against Theft" and the program "is intended to be an effective deterrent against employee dishonesty, to safeguard the financial well-being of the company and it's [sic] employees, and to provide a more peaceful and pleasant atmosphere where our honest employees can work effectively." (Ex. 2 to Zawojski Aff., Ex. E to Appx.) The explanation also states: "[t]he program is also intended to bring to the Company's attention any harassment problems or improper management practices." (*Id.*) Thus, although "harassment" is mentioned, the MR. HEAT program appears primarily to encourage employees to report other employees for theft, rather than to lodge complaints of discrimination against supervisors.

Follett asserts that the MR. HEAT program is posted in each bookstore. (Def.'s 56.1 ¶ 11.) Anderson disputes this by asserting that an internal audit of the Chicago State store when he was Store Manager revealed that the MR. HEAT sign was absent.[8] (Pl.'s 56.1 Resp. ¶ 11.) It is undisputed, however, that Anderson was aware of the MR. HEAT program. (Pl.'s Dep., at 21.)

## B.    Roosevelt University Bookstore

Anderson began working as the Store Manager at the Roosevelt bookstore in December 1994, (Def.'s 56.1 ¶ 20), reporting to Follett Regional Manager Paul McKita. (Pl.'s Dep., at 66.) During his tenure, Anderson had a poor relationship with a white Roosevelt employee, Michael Durnil, who was Follett's campus contact there. (Def.'s 56.1 ¶ 23.) Durnil complained to Anderson, McKita, and Follett management about several issues involving Anderson, including that Anderson

---

[8]     As Follett points out, however, it was likely Anderson's responsibility as Store Manager to ensure that signs related to employment and labor policies were posted.

was improperly dressed and that Easter decorations at the bookstore were inappropriate.[9]  (Pl.'s Dep., at 68-70.)  When McKita confronted Anderson about Durnil's complaints, Anderson denied Durnil's allegations, (*id.* at 70, 132), and told both McKita and Follett Vice President of Operations and Sales Steve Pribyl that Durnil was "being racist."  (*Id.* at 132.)  McKita, Anderson acknowledges, "didn't act racist" and eventually took Anderson's side in the dispute.  (*Id.* at 70, 131-32.)  Nonetheless, according to Anderson, Pribyl told him that Follett needed to "save the [Roosevelt] contract."  (*Id.* at 71-72, 134-35.)  In October 1996, apparently because of Anderson's problems with Durnil, he was transferred to the bookstore at Virginia State.[10]  (Def.'s 56.1 ¶23.)

### C.    Virginia State University Bookstore

Anderson began his tenure as Store Manager of the Virginia State bookstore in October 1996.  (*Id.*)  Anderson asserts, and Follett admits, that "the [Virginia State] community thought well" of him, and that no bookstore employees brought complaints against him while he was there.  (Pl.'s 56.1 Addnl. ¶ 3.)  In contrast to his rocky relationship with Durnil, Anderson asserts that he received a positive recommendation letter from Virginia State's Follett liaison.  (*Id.*)  In both 1997 and 1998,

---

[9]     The record does not reveal anything further about the precise nature of Durnil's complaints.  Anderson testified in his deposition that Durnil complained about "a lot of things.  I can't remember everything."  (*Id.* at 70.)

[10]     Follett asserts that Anderson "admits that he had performance problems while working at the Roosevelt University Bookstore, and that his poor relationship with Durnil led to his transfer in 1996 to the Virginia State University Bookstore as Store Manager."  (Def.'s 56.1 ¶ 23.) The portion of Anderson's testimony that Follett cites does not entirely support this assertion.  When asked whether the transfer was "a result of your performance problems," Anderson answered "with Michael Durnil, yes."  (Pl.'s Dep., at 72.)  The court does not construe this exchange as an admission by Anderson of general "performance problems"; rather, the most reasonable interpretation of Anderson's answer is that he believed that his transfer was the result of the particular problems that he had been having with Durnil.  The parties appear to agree that Anderson's relationship with Durnil was the cause of Follett's decision to transfer Anderson; indeed, Anderson testified that Durnil requested that he be transferred, and that Pribyl acquiesced to this demand in order to save the Roosevelt contract.  (*Id.* at 71-72.)
    Anderson, in his LR 56.1 statement of additional facts, now asserts that he was "promoted" to the Virginia State store "because of his experience and knowledge of reestablishing a store." (Pl.'s 56.1 Addnl. ¶ 2.)  Anderson cites to no authority in support of this assertion, and the record contains none.

the Virginia State bookstore had the second highest profit increase in Follett's "Gold East Region", which compromised more than 100 Follett bookstores.  (*Id.*)

During his time at the Virginia State Bookstore, Anderson occasionally had contact with Follett Group Vice President Bob Scholl.  (Def.'s 56.1 ¶¶ 25, 27.)  Anderson claims that Scholl made various statements that Anderson found offensive.  (*Id.*)  At one point, Anderson recalls, Scholl told him: "I don't care how long you have been with the company; if you're not performing you will be fired."[11]  (*Id.* ¶ 25.)  On another occasion, Scholl told Anderson to "get his ass into the meeting," and on yet another occasion told Anderson not to be late.  (*Id.* ¶ 27.)  Anderson believes these comments reflected racial animus; he conceded, however, that he never heard Scholl make any comments about his race or the race of anyone else.  (*Id.*; Pl.'s Dep., at 125, 186.)

While at the Virginia State bookstore, Anderson reported to Follett Regional Manager Lynne Vaughan, who is white.  (Def.'s 56.1 ¶ 24.)  After an internal audit revealed accounting deficiencies at the store, Vaughan inspected the store on September 29 and 30, 1999.  She then issued a written warning to Anderson listing six areas in which he needed to improve his performance and the performance of the store and its employees.[12]  (*Id.* ¶ 28; Memo from Vaughan to Anderson of Sept. 30, 1999, Ex. N to Appx.)  As areas requiring improvement, Vaughan specifically identified store appearance, merchandise assortment, textbook inventory, accounting operations, excess payroll hours, and the internal audit findings.  (Def.'s 56.1 ¶ 28.)  Anderson admitted in his

_____

[11]    In his deposition, Anderson testified that Scholl made this comment "when I got to Virginia State the first meeting I went to."  (Pl.'s Dep., at 122.)  He now claims that it happened in 1999, (Pl.'s 56.1 Resp. ¶ 25), which appears to be a more accurate recollection as it is undisputed that Follett hired Scholl on March 29, 1999.  (*Id.* ¶ 26.)

[12]    Anderson denies this assertion, contending that the document was not titled "Written Warning," that store visits were routine, and that audits were never done when the previous Store Manager ran the Virginia State store.  (Pl.'s 56.1 Resp. ¶ 28.)  Anderson's denial is unsupported.  The document indeed warns Anderson that "[a]nother poor store visit, or poor audit, will be cause for further discipline."  (Memo from Vaughan to Anderson of Sept. 30, 1999, Ex. N to Appx., at 3.)  Anderson's additional assertions are immaterial and not inconsistent with Follett's assertion.

deposition that he had problems satisfactorily completing required paperwork while at the Virginia State store, that he incurred late fees from vendors, that invoices were not getting to accounts payable on time, and that his store was occasionally messy.[13]  (*Id.* ¶ 29; Pl.'s Dep., at 87-89.)

In December 1999, Vaughan completed an annual performance appraisal of Anderson. (Def.'s 56.1 ¶¶ 31-33.)  Anderson rated a 3.4 in the "People First" category, a 2.75 in the "Managerial/Professional" category, a 2.3 in the "Objectives" category, and a 2 in the "Financial Soundness/Accountabilities" category, for an overall performance rating of 2.6 out of 5; this was at the bottom of the "standard" range of 2.6 to 3.5.  (1999 Performance Appraisal, Ex. O to Appx., at 4.)  Vaughan noted that Anderson "is a vital part of [Virginia State University]" and "is well liked on campus," (*id.* at 1), but she emphasized "poor store appearance," (*id.* at 2), and a failure to meet objectives in accounting practices and employee management.  (*Id.* at 3.)  Specifically, Anderson was rated a "1" ("Unsatisfactory") for failing to conduct daily performance meetings with employees and to reduce accounting fees, both of which had been listed as "objectives" on Anderson's previous review.  (*Id.*)  Vaughan also noted that Anderson "needs to be consistent in treating the employees—do not react to employee problems when you are angry with an employee."  (*Id.* at 1.)

In an April 2000[14] performance appraisal, Vaughan gave Anderson a performance rating of 2.69 out of 5.  (Def.'s 56.1 ¶ 34.)  Vaughan again observed that Anderson's staff development and direction needed improvement, noting that he needed to meet with and set "clear goals" for his staff, that he "need[ed] to learn to trust people," and that he had failed to "develop employees into key

---

[13]     Anderson purports to deny this assertion by contending that the store was difficult to operate due to difficulties in finding and training employees, and the need to "work football games on the weekends."  (Pl.'s  56.1 Resp. ¶ 29.)  These justifications do not contradict Follett's assertions concerning Anderson's deposition testimony.  (Pl.'s Dep., at 87-89.)

[14]     Although the copy of the appraisal in the record is itself undated, Follett asserts, and Anderson does not dispute, that the appraisal took place in April 2000.  (Def.'s 56.1 ¶ 34.)  The parties do not explain why Anderson was reviewed so soon after his annual appraisal in December 1999; as Anderson was transferred to the Chicago State store in May 2000, the appraisal may have been done for reasons related to his transfer, rather than as a regularly-scheduled annual appraisal.

positions in the store," including positions of text coordinator, accounting manager, and merchandise coordinator. (2000 Performance Appraisal, Ex. P to Appx., at 2.) She also commented that although Anderson had achieved an increase in sales, he had missed the budgeted sales goal. (*Id.*) In his deposition, Anderson admitted that during that review period he had indeed missed his sales goal and had had problems developing employees in the positions listed by Vaughan.[15] (Def.'s 56.1 ¶ 35; Pl.'s Dep., at 146-48.)

Anderson believes that the low appraisal ratings he received while at Virginia State were due to retaliation. (Pl.'s Dep., at 142-45.) Specifically, he believes that Vaughan gave him low ratings in retaliation for his complaints to McKita and Pribyl, during his tenure at the Roosevelt bookstore, about Durnil's alleged racism. (*Id.* at 144; Def.'s 56.1 ¶ 36.) As a result of those complaints, according to Anderson, "Bob Scholl was very critical to Lynne Vaughan about me." (Pl.'s Dep., at 144.) In his deposition, Anderson testified that "[Vaughan] said Bob Scholl was always on her case and she would also lose her job over this store if it did not get up to par." (*Id.* at 144.) Anderson admitted in his deposition that this is the only evidence he has that he received low appraisal ratings from Vaughan in retaliation for complaining about Durnil's alleged racism.[16]

_____

[15]     Follett, citing to the April 2000 appraisal, asserts that Anderson received his 2.69 rating because "neither his performance, nor the performance of the bookstore, improved" from the December 1999 review. (Def.'s 56.1 ¶ 34.) This assertion is unsupported. Anderson in April 2000 scored a 3.00 in the "People First" category, 2.77 in "Managerial/Professional", 2.00 in "Financial Soundness/Accountabilities", and 3.00 in "Objectives". (2000 Performance Appraisal, Ex. P to Appx., at 3.) Thus, his "Objectives" score—identified by Vaughan, as noted, as a key shortcoming in the December 1999 appraisal—actually increased from 2.3 to 3. Vaughan's comments in the April 2000 appraisal do not refer to the 1999 appraisal, nor state that Anderson's performance or that of the bookstore had failed to improve. In fact, although the store missed the budgeted sales goal, she notes that sales increased by 7.53% and "shrink" decreased. (*Id.* at 2.)

[16]     In his LR 56.1 response, Anderson now contends he has other evidence linking his complaints about Durnil to his low appraisal ratings, and asserts that another Follett employee, Daryl Atkins, told him that Bob Scholl was "out to get" him. (Pl.'s 56.1 Resp. ¶ 36; Pl.'s Dep., at 191.) Anderson testified that he heard this (double) hearsay statement long after he left the Virginia State bookstore, however, and does not, in his testimony, connect it to Vaughan, Durnil, or the events at either Roosevelt or Virginia State.

The court further notes that in his summary judgment filings, Anderson makes various

9

(*Id.* at 144-45.)

### D.    Chicago State University Bookstore

In May 2000, Follett transferred Anderson from the Virginia State bookstore to the store at Chicago State. (Def.'s 56.1 ¶ 38.) Follett's reasons for doing so are unclear; Follett asserts that it needed a new manager at Chicago State and "wanted to give Anderson a fresh start to improve his performance," (*id.*), but the court concludes that this assertion is unsupported.[17] (*Id.*) Nor does the record reveal who made the decision to transfer Anderson.[18] For his part, Anderson considered the transfer a "promotion" and a "positive move," (Pl.'s Dep., at 92), and the parties agree that he was amenable to returning to Chicago. (*Id.* at 83; Def.'s 56.1 ¶ 38.) He received a 10% pay increase as a result of the transfer, (*id.* at 93), and was "happy" with his salary at the Chicago State store. (*Id.* at 86.) He does not believe the transfer had anything to do with his race.[19] (*Id.* at 198;

---

assertions that appear to suggest racial bias on Vaughan's part, including that she told him that she felt "screwed over" by a black manager at a previous job and that she had referred to several black Follett employees as "homeboys." (Pl.'s Addnl. ¶¶ 5-8.) None of these assertions find any support in the record, and nothing indicates that Vaughan harbored any racial animus towards Anderson or anyone else. Indeed, she concluded her September 30, 1999 memo as follows:

> Milton, you and I have worked together for over 3 years. I know how hard you work. I know that this is a tough campus, but cleaning up basic operations will make your job easier. No one wants you to succeed more than I do. But, you are the one that needs to make it happen.

(Memo from Vaughan to Anderson of Sept. 30, 1999, Ex. N to Appx., at 3.)

[17]    Follett cites to Zawojski's affidavit, (Zawojski Aff. ¶ 12), but she did not join Follett until July 2000. Her testimony as to events prior to July 2000 is based on review of company records. (*Id.* ¶ 2.) She does not identify the records that purportedly reflect Follett's motivation in transferring Anderson, nor otherwise explain the source of her purported knowledge of that motivation, however. The court is thus not satisfied that her assertions of that motivation have sufficient foundation.

[18]    Vaughan testified in her deposition that it was Scholl's decision, (Vaughan Dep., Ex. C to Supp. Appx., at 42), but Scholl testified that he had had "nothing to do with the transfer." (Scholl Dep., Ex. B to Appx., at 53.)

[19]    In his LR 56.1 response, Anderson states that he "didn't have positive proof at the time of his deposition that the transfer had anything to do with race, but it was in the back of his mind" because, according to Anderson, Follett recruited only blacks for positions at historically black colleges like Chicago State. (Pl.'s 56.1 Resp. ¶ 38.) Nonetheless, when asked in his deposition

Def.'s 56.1 ¶ 38.)  While at Chicago State, Anderson reported to Follett Regional Manager Theresa Humanicki, who in turn reported to Scholl.  (Def.'s 56.1 ¶ 39.)

Sometime in the summer of 2000, Jennie Ward Robinson began working for Follett in its human resources department.  (Def.'s 56.1 ¶ 40.)  As a new hire, Robinson participated in an orientation and training program which included a tour of the Chicago State bookstore.  (*Id.*)  After this tour, Robinson contacted Follett Senior Vice President of Human Resources Audrey Southard. (*Id.*)  Robinson told Southard that the store was in poor condition, and related several comments that Anderson had made in the course of their conversation during the tour.  (*Id.*)  Specifically, Anderson told Robinson that he wanted to "get promoted higher" but that "there were not African-Americans in like certain positions."  (*Id.* ¶ 41; Pl.'s Dep., at 163.)  He also told Robinson about the comments Scholl allegedly made to him when he was at the Virginia State store; that Humanicki had refused to grant his recent request for a two-week vacation; that his bookkeeper at the Roosevelt store had been terminated; that other managers had complained that they had not received their "just due"; and that he had served on Follett's Diversity Council.[20]  (Def.'s 56.1 ¶ 41.)

The day after his conversation with Robinson, Southard called Anderson and invited him to lunch.  (Pl.'s Dep., at 164.)  At lunch, Anderson told Southard the same things he had told

---

whether he was "claiming in this lawsuit at all that you were transferred to Chicago State because of your race," Anderson answered "no," and repeated that answer when asked again.  (Pl.'s Dep., at 198.)  Moreover, his citations to the record provide no support for his additional allegation that Follett recruited only blacks for historically black colleges.

[20]    Anderson does not identify the "certain positions" at Follett that allegedly were not filled by black employees, nor the other (presumably, black) managers who had allegedly complained.  The court can find no information in the record concerning a terminated bookkeeper at Roosevelt.  As for the "Diversity Council," Anderson testified that it was established in the late 1980s or early 1990s, consisted of more than twenty people (both white and black), met for a week at a time several times a year, but was soon disbanded.  (Pl.'s Dep., at 74-77.)  He does not discuss the purpose of the council, and the record does not appear to contain further information.
Anderson testified that he requested a two-week vacation when he first arrived at Chicago State in May 2000, but that Humanicki approved only three days off because the Chicago State store was undergoing remodeling.  (*Id.* at 99.)

Robinson, and added that he believed Durnil had discriminated against him during his tenure at the Roosevelt store, but that Steve Pribyl "didn't care." (*Id.* at 165; Def.'s 56.1 ¶ 43.) Although the substance of Anderson's comments to Southard and Robinson is undisputed, the parties characterize them differently. Follett asserts that Anderson did not believe he was making a "complaint to Follett about discrimination" in either of the conversations. (Def.'s 56.1 ¶¶ 42, 43; Pl.'s Dep., at 164, 166.) Anderson responds that although he may not have been making a "formal" complaint, he was making an "informal" one because Follett "didn't have any mechanisms for receiving formal complaints."[21] (Pl.'s 56.1 Resp. ¶¶ 42, 43.) It is undisputed that following his lunch with Southard, Anderson had no further contact with Southard, did not use the MR. HEAT hotline, and did not complain to anyone else at Follett about racial discrimination.[22] (Def.'s 56.1 ¶ 44.)

On April 13, 2001, Humanicki issued a memo entitled "Written Warning for unacceptable performance" to Anderson that addressed "the mismanagement of accounts receivable and Bookstore Vouchers, unacceptable accounting procedures, and unsatisfactory financial performance" at the Chicago State bookstore. (Def.'s 56.1 ¶ 45; Memo from Humanicki to

---

[21]     In his deposition, Anderson indeed testifies that he did not believe he was making a complaint in either conversation. When asked, "When you were making these comments to Ms. Robinson, did you believe that you were making a complaint to someone at Follett?" Anderson responded, "No." (Pl.'s Dep., at 164.) In response to the question, "So when you were talking to Audrey Southard, did you consider yourself making a complaint to Follett about discrimination?" Anderson answered, "No. I thought I was about to get terminated. I was terrified." (*Id.* at 166.) Finally, when asked, "Did you ever contact anyone else at Follett to complain about discrimination?" Anderson responded, "No, no." (*Id.*)
        Nonetheless, regardless of whether Anderson believed he was making a (formal or informal) "complaint," it appears that Follett took his comments as such. Director of Employee Relations Zawojski testified in her deposition that after Anderson's conversation with Southard, Southard informed Zawojski of "potential complaints" that Anderson had voiced to both Southard and Robinson. (Zawojski Dep., at 67.) When asked "Were you informed in any way of complaints of racial discrimination that [Anderson] made while talking with Jenny Ward Robinson?" Zawojski answered, "I was informed by Audrey Southard after she had met with [Anderson]." (*Id.* at 114.)

[22]     Anderson denies this by asserting that he also complained to Vaughan. (Pl.'s 56.1 Resp. ¶ 44.) In his deposition, he testified that he complained to Vaughan in February 2001 that he was being "treated unfairly"; when asked whether he told Vaughan that he believed he "was being discriminated against," however, he answered, "no." (Pl.'s Dep., at 137-38.)

Anderson of April 13, 2001 ("April 2001 Warning"), Ex. Q to Appx., at 1.) Humanicki noted "ongoing performance concerns about day to day responsibilities as the Store Manager that are not currently at an acceptable level." (April 2001 Warning, at 1.) Specifically, Humanicki referred to (1) Anderson's "lack of urgency" in responding to and implementing Humanicki's initiatives and directives for the store; (2) an investigation, pursuant to an anonymous call placed to the MR. HEAT hotline, that "uncovered" Anderson's "[l]ack of professionalism" in areas including "[v]erbal communication, attitude and dress code", a "[l]ack of compliance to dress code policy attendance policy and store security", the "[a]dmittance of non-Follett employees in secure areas", and Anderson's "[l]ack of . . . presence on [the] sales floor and in the store"; and (3) "performance expectations . . . that require immediate improvement" in seven particular areas, including the timely completion of paperwork, billing and collection of accounts receivable, increasing presence on the sales floor and communicating goals to staff, transmitting "mark up and mark down figures" to Humanicki on a weekly basis, "[c]ommunicat[ing] clearly with department managers [and] colleagues," completing directives "by deadline dates", and complying with Follett policies with regard to "dress code, attendance and store security." (*Id.* at 1-2.) The memo concluded with a warning that "further violations of company policy or procedure will result in additional corrective action, up to and including the termination of your employment with Follet." (*Id.* at 2.)

In his deposition, Anderson admitted that prior to the April 2001 Warning, he had not always completed paperwork in a timely manner and had not always been present on the sales floor. (Def.'s 56.1 ¶ 46; Pl.'s Dep., at 150-51.) Follett asserts that Anderson "admits he may have worn ripped clothing to work." (Def.'s 56.1 ¶ 47.) In fact, when asked "Did you ever wear khaki pants to work with a hole in the seat?" in his deposition, Anderson answered, "I know I have torn my slacks working around [store] fixtures." (Pl.'s Dep., at 201.) Anderson admitted to dozing off while working, (Def.'s 56.1 ¶ 48), and although Anderson now disputes this, he indeed stated, "if I dozed off, maybe I did," when asked if he had ever slept in his office. (Pl.'s Dep., at 201.) Anderson also

admitted that even after receiving the April 2001 Warning, he did not complete all paperwork in a timely manner and was not always present when needed on the sales floor.[23] (Def.'s 56.1 ¶ 49.)

Anderson claims, however, that when he discussed the April 2001 Warning with Humanicki, he informed her that the conditions at the Chicago State store were, in certain respects, due to circumstances beyond his control. (Pl.'s 56.1 Addnl. ¶ 11.) He asserts that for a one-month period at the beginning of his tenure at Chicago State in 2000 he did not have a bookkeeper on staff. (*Id.*) He also asserts, citing only to his own deposition testimony, that Follett Auditor Ted Dec made a $400,000 mistake during fiscal year end inventory, at some point before Anderson received the April 2001 Warning, (*id.*; Pl.'s Dep., at 153); the record does not appear to contain any further information about this alleged mistake. Anderson further asserts that book vouchers left over from the previous Store Manager were unpaid when Anderson started at the Chicago State store. (Pl.'s 56.1 Addnl. ¶ 11.) For its part, Follett does not deny these assertions; rather, it "admits that Plaintiff believed that [these] factors . . . existed" but maintains that they had no impact on Anderson's performance problems and are immaterial. (Def.'s 56.1 Addnl. Resp. ¶ 11.)

In May 2001, Humanicki rated Anderson as "Below Standard", with a score of 1.98 out of 5, on his annual performance appraisal for 2001. (*Id.* ¶ 50.) In the three-category format Follett had adopted since Anderson's last review, he received a 2.00 in "People First", a 1.93 in "Managerial/Professional", and a 2.00 in "Financial Soundness/Accountabilities". (2001 Performance Appraisal, Ex. R to Appx., at 4.) In her comments, Humanicki noted that the Chicago State store "had the must customer service complaints in the region for the last year," (*Id.* at 2-3), and observed, without elaboration, that the financial results for the 2001 fiscal year at the store were "unacceptable." (*Id.* at 4.) She stated that "[t]his review will be used as a written counseling due to the substandard performance and lack of follow up to the counseling delivered to [Anderson]

---

[23] Anderson disputes this assertion, but cites to nothing that may be construed as contradicting his deposition testimony. (Pl.'s 56.1 Resp. ¶ 49.)

on April 13, 2001."[24]  (*Id.*)  Anderson believes that his low rating on this performance review was the result of the comments he had made to Robinson and Southard.  (Pl.'s Dep., at 168-69.)

Anderson's performance was not reviewed again until June 2002.  (Def.'s 56.1 ¶ 52.)  Follett does not explain why, in light of the performance deficiencies Humanicki identified in both the April 2001 Warning and the May 2001 performance appraisal, Follett did not review Anderson's performance again for more than a year.  In the June 2002 appraisal, Humanicki again rated Anderson as "Below Standard", with an overall score of 1.89 out of 5.  (*Id.)*  His "People First" score slipped to 1.75, and his "Managerial/Professional" to 1.79.  (2002 Performance Appraisal, Ex. S to Appx., at 5.)  In her comments, Humanicki stated that Anderson "has been disrespectable [sic] on several occassions [sic] during conversations and meetings to his colleagues," and noted a specific incident, from April 25, 2002, where Anderson "had a confrontational encounter with the Regional Loss Prevention Manager regrading the Checkpoint system relocation."  (*Id.* at 2.)  Although Humanicki characterized Anderson as disrespectful, she also observed that he "has a tendency to avoid confrontation" with his employees and "makes excuses for why someone is performing poorly."  (*Id.* at 2-3.)  She further noted that the "environment . . . dress code, sense of urgency and overall operations" at the Chicago State store were "below standards," that "[Anderson] and the store team usually do not acheived [sic] goals and objectives" and often miss deadlines, that Anderson had missed conference calls, and that several accounts receivable were past due.  (*Id.* at 2-4.)  Although Humanicki acknowledged that Anderson had "showed improvement shortly after the [April and May 2001] counseling and review," she concluded by stating that "[t]his review will

_____

[24]     Follett further asserts that Anderson "admits that, as noted by Humanicki on the appraisal, he had a tendency to yell at employees."  (Def.'s 56.1 ¶ 51.)  In fact, however, Humanicki's appraisal contains no reference to Anderson "yelling" at anyone; rather, she merely noted that "[a]t times, he can be disrespectful to his team and peers."  (2001 Performance Appraisal, Ex. R to Appx., at 2.)  In his deposition, Anderson admits that he "raised [his] voice" to one particular employee "more than once," but states that he never raised his voice to any other employee.  (Pl.'s Dep., at 157-58.)  He does admit that he "spoke strongly" to other employees, (*id.* at 158), but did not admit, as Follett asserts, to any "tendency to yell."

15

be considered a final writtening [sic] warning with a 90 Day Probation Period." (*Id.* at 5.)

On June 7, 2002, Humanicki sent Anderson a notice, informing him that "[a]s a result of your below standards performance rating you are being placed on performance probation for the period June 7, 2002 through September 5, 2002." (Def.'s 56.1 ¶ 54; Performance Probation Notice, Ex. T to Appx.) Six performance objectives were outlined for Anderson to meet during the probationary period, including improving communication with staff and the campus; providing leadership on the sales floor; reporting to work on time; showing respect to colleagues, other managers, and customers; appropriately addressing subordinates' performance issues; and complying with company audit and accounting policies. (Def.'s 56.1 ¶ 55.) Humanicki asked Anderson specifically to conduct weekly staff meetings and submit both an agenda and an e-mail recap of those meetings to Humanicki and to Scholl; to follow correct call-in procedures if he would be absent from work; to rewrite performance reviews for seven employees; and to "review" the results of a March 2002 audit and "send recap out [sic] Audit Action Plan that will be implemented." (Performance Probation Notice, Ex. T to Appx.) The notice warned Anderson that if he did not satisfactorily meet the outlined performance objectives during the probationary period, his employment would be terminated. (*Id.*)

When asked about Humanicki's appraisals in his deposition, Anderson admitted that he had missed deadlines and conference calls, (Pl.'s Dep., at 171, 174); that he indeed had had a confrontation over the phone with loss prevention manager Candy Stoll in April 2002, in which he disagreed with her decision to relocate security gates to a new store location while the current location was still operating, (*id.* at 171-72); that he had not disciplined an employee when he should have, (*id.* at 173); and that he had past-due accounts receivable.[25] (*Id.* at 174.) He also admitted

---

[25]     Anderson now denies this assertion, but fails to cite anything inconsistent with his deposition testimony; rather, he merely offers justifications for these performance issues. (Pl.'s 56.1 Resp. ¶ 53.)

that prior to the probationary notice, he had occasionally failed to follow call-in procedures, (*id.* at 179), and that during the probationary period, he occasionally failed to submit the required agenda and e-mail recap for staff meetings. (*Id.* at 178; Def.'s 56.1 ¶ 57.)

Anderson asserts that Follett's written employee policies do not have any "guidelines or wording for placing an employee on probation." (Pl.'s 56.1 Addnl. ¶ 18.) According to Follett, its policies do provide for "progressive discipline," which includes probation. (Def.'s 56.1 Addnl. Resp. ¶ 18.) Both parties cite to a Follett document titled "General Guidelines for Progressive Discipline, Suspension, and/or Involuntary Termination" (the "Guidelines"), which, in a section labeled "Progressive Discipline," states that as part of a procedure designed "to ensure an employee is not terminated without a complete and objective assessment of all the facts", discussions and "counseling sessions" between supervisors and employees "are to be documented" with an identification of "the problem area", "[s]pecific ways to improve performance," and a "[d]eadline for improvement." (Guidelines, Ex. 4 to Humanicki Dep., Pl.'s Vol. 1 Ex. J.) The document does not contain the term "probation," and when Humanicki was asked in her deposition whether Follett has "any guidelines or procedures regarding placing an employee on probation," she answered, "Not on this particular document." (Humanicki Dep., at 33.) She also testified, however, that "[t]he probationary period is generally used as part of progressive discipline." (Humanicki Dep., at 32.)

### E. Anderson's Termination

Anderson's probation ended on September 5, 2002. (Termination Notice, Ex. U to Appx.) On September 17, 2002, Follett terminated Anderson for failure to meet the outlined performance objectives during the probationary period. (*Id.*; Def.'s 56.1 ¶ 62.) Specifically, in a termination notice addressed to Anderson, Humanicki stated that his floor presence had not improved; that there had been many (unidentified) customer service complaints; that "the disrespectful behavior toward colleagues, managers and customers continued to surface"; that Humanicki had witnessed "shouting matches with raised voices and negative attitude"; that Anderson had continued to

tolerate unacceptable employee behavior; and that Anderson had failed to "follow up" in response to a March 2002 internal audit. (Termination Notice, Ex. U to Appx.) The notice informed Anderson that he was being terminated because, based on a "review of [his] past performance, along with the unacceptable results during the Performance Probation period," he had "not shown improvement to a satisfactory level of performance." (*Id.*)

Anderson disputes Follett's assertion that he did not meet the outlined objectives during the probationary period. (Pl.'s 56.1 Resp. ¶ 62.) To support his denial, he asserts that he had increased both sales and profits, and decreased inventory "shrink" during 2002. (*Id.*) Anderson does not expressly assert that he met any of the specific performance objectives that were outlined for him to meet during the probationary period, none of which related to the financial performance of the Chicago State bookstore. The court notes, however, that in the Termination Notice, Humanicki noted that Anderson had in fact sent the requested meeting agendas and e-mail recaps each week, and had indeed rewritten performance appraisals as requested. (Termination Notice, Ex. U to Appx.) The notice made no mention of Anderson's attendance issues.

Follett does not explain who made the decision to terminate Anderson. Humanicki testified in her deposition that she decided to terminate him, (Humanicki Dep., at 113-14), and Scholl referred in passing to the termination as "[Humanicki's] decision," (Scholl Dep., Ex. B to Appx., at 124), but it appears that she made the decision in consultation with Zawojski and Scholl. Citing to Zawojski's affidavit, Follett asserts that in or around May 2002, Humanicki had begun consulting with Zawojski and Scholl regarding Anderson's "continued performance problems." (Def.'s 56.1 ¶ 61; Zawojski Aff. ¶ 14.) E-mails attached to Anderson's LR 56.1 materials reveal more specifically the nature of these consultations. In an e-mail dated May 2, 2002, Humanicki recounted several incidents involving Anderson from March and April 2002, explained that this is "just the tip of the iceberg," and asked Zawojski and Scholl for "help in guiding me in order for me to terminate him." (E-mail from Humanicki to Zawojski and Scholl of May 2, 2002, Pl.'s Vol. 2, at D0837-40.) The

incidents that Humanicki described involved Anderson's disagreements with Follett personnel over security procedures, including the phone "confrontation" with Stoll in April 2002; instances where Humanicki and/or Stoll had tried to contact Anderson at the store, but he was absent; and Anderson's "blatant" disregard of Humanicki's request that he send his employees' performance appraisals to her, rather than to Follett central management. (*Id.*)

In response to Humanicki's request for guidance, Zawojski and Scholl had advised Humanicki to "place [Anderson] on corrective action for unacceptable performance," and they together continued to review Anderson's performance during the probationary period. (Def.'s 56.1 ¶ 61.) In an e-mail dated August 9, 2002, Humanicki again sought "advice from both [Zawojski] and [Scholl]"; noting that Anderson's "performance has not improved" 60 days into his probation, she asked "Do we wait or cut him loose now?" (E-mail from Humanicki to Zawojski and Scholl of August 9, 2002, Pl.'s Vol. 2, at D0831.) After the end of Anderson's probationary period on September 5, 2002, Humanicki met with Zawojski to discuss Anderson's termination and e-mailed her a draft of a termination notice. (E-mail from Humanicki to Zawojski and Scholl of September 12, 2002, Pl.'s Vol. 2, at D0833.)

At Humanicki's request, police were present at the scene of Anderson's termination on September 17, 2002. (Pl.'s 56.1 Addnl. ¶ 20.) Zawojski testified in her deposition that this is appropriate procedure in circumstances where an employee may become belligerent or disruptive. (Zawojski Dep., at 116.) Scholl accompanied Humanicki to the Chicago State store for Anderson's termination; in his deposition, he explains that he did so in order to "support [Humanicki] and her decision," and that he supervised Anderson's removal of his personal belongings to prevent him from taking Follett property. (Scholl Dep., Ex. B to Appx., at 123-25.) Although Anderson asserts that Scholl blocked a video monitor at Anderson's desk so he could not see police waiting at the front door, (Pl.'s 56.1 Addnl. ¶ 20), this assertion is unsupported; Anderson cites only to a portion of Scholl's deposition in which Scholl expressly denied having done so. (Scholl Dep., at 128.)

Brenda Robinson, a black female, replaced Anderson as Store Manager of the Chicago State store. (Def.'s 56.1 Reply ¶ 62; Pl.'s 56.1 Resp. ¶ 68.) Humanicki testified in her deposition that Greg Hartoonian, who is white and had previously worked at another company with Humanicki, interviewed for the Chicago State position, but was not given the job. (Humanicki Dep., at 55-57.)

## F. Anderson's Assertions of Discrimination and Unfair Treatment

Anderson asserts that Humanicki gave him low ratings on his performance appraisals because of his race and/or because he complained about race discrimination, (Def.'s 56.1 ¶ 59; Pl.'s Dep., at 155, 161), specifically in his comments to Jennie Ward Robinson and Southard. (Pl.'s Dep., at 168-69.) Anderson also claims that Humanicki treated him unfairly by refusing to approve his request for a two-week vacation when he first arrived at Chicago State in May 2000, instead approving only three days because of an upcoming store remodeling; by allowing other Store Managers to stay in hotel rooms for regional meetings in Oak Brook, Illinois, while Anderson had drive there from home; and by re-hiring an employee over Anderson's objection.[26] (Def.'s 56.1 ¶ 58; Pl.'s Dep., at 100-04, 190, 231.)

Anderson also claims that Humanicki, Scholl, and Pribyl sent him "threatening" e-mails, which increased in frequency after his conversations with Jennie Ward Robinson and Audrey Southard. (Pl.'s 56.1 Addnl. ¶ 19.) Anderson further asserts that Humanicki, Scholl, and Candy Stoll sent each other e-mails that he characterizes as "character assassination" and that contained information relating to his health and personal business. (Id.) To support these assertions,

---

[26]     In his deposition, Anderson testified that the re-hired employee, Brenda Farris, who is black, had been a supply manager at the Chicago State store, but that her position had been eliminated before Anderson arrived. (Pl.'s Dep., at 100.) According to Anderson, Farris called him at the store, sometime in the summer of 2000, and asked him "what's the F with Follett?" (Id. at 101.) Humanicki then told Anderson that Farris was "threatening to take action" and so Humanicki "had to bring her back." (Id. at 101-02.) Anderson asked that Farris be sent to another store because "she cursed at me" over the phone, (id. at 100, 104), but Humanicki re-hired her as a supply clerk anyway, under Anderson's supervision. (Id. at 102-03.) He further testified that after she had been re-hired, Farris did not clean properly, did her school homework while on the clock, and argued with another employee. (Id. at 103-05.)

Anderson divides one paragraph in his LR 56.1 statement of additional facts into thirty subparagraphs, each containing a summary or paraphrase of a particular e-mail. (*Id.*) Although this procedure violates LR 56.1, *see* N.D. Ill. R. 56.1(b)(3)(C) (limiting non-moving party to forty statements of fact in short, numbered paragraphs), the court has considered the actual content of the e-mails where relevant.[27] Even using Anderson's summaries, messages Anderson calls "threatening" generally involve instructions for specific tasks for Anderson to complete, or reminders to complete tasks that he had failed to complete, and those he deems "character assassination" generally involve discussions, shortly before and during Anderson's probationary period, of his performance problems.[28] In addition, Anderson's assertion that the e-mails increased in frequency after he spoke to Southard and Robinson is unsupported, as he provides no indication of how frequent the e-mails were before.

Finally, Anderson claims that an August 14, 2002 letter from Follett President Tom Christopher "in its context was racist." (Pl.'s 56.1 Resp. ¶ 60.) Christopher wrote that it was "a

---

[27] Anderson's paraphrasing, summaries, and quotations from the e-mails are often inaccurate and misleading. For instance, Anderson asserts that Humanicki, in a May 2000 e-mail sent to him and copied to Scholl, "states 'Plaintiff must be flawless on issues.'" (Pl.'s 56.1 Addnl. ¶ 19.) In fact, the cited e-mail outlines specific tasks for Anderson to complete in setting up a new store location, and states, "The timeline is growing very short and you need to ensure flawless execution of all the tasks which must be completed . . . over the next several days." (E-mail from Humanicki to Anderson of May 7, 2002, Pl.'s Vol. 2, at D0868.) Similarly, Anderson asserts that Humanicki in a May 2, 2002 e-mail to Zawojski and Scholl "talks about the Plaintiff's health," (Pl.'s 56.1 Addnl. ¶ 12), when in fact the message recounts an incident in which she could not contact Anderson for two days, and Anderson explained his absence by stating that he had been in the hospital due to bronchitis. (E-mail from Humanicki to Zawojski and Scholl of May 2, 2002, Pl.'s Vol. 2, at D0838.)

[28] In one of the "threatening" e-mails, for example, Anderson asserts that "Humanicki sent Plaintiff a calendar of events to follow." (E-mail from Humanicki to Anderson of April 16, 2002, Pl.'s Vol. 2, at D0872.) He summarizes another as "telling Plaintiff he needs to collect on CSU unpaid bills." (E-mail from Scholl to Anderson of March 5, 2001, Pl.'s Vol. 2, at D0835.) In one of the "character assassination" e-mails that Anderson characterizes as discussing his "personal business", Humanicki informs Zawojski and Scholl of an incident where she had been unable to contact Anderson, and when she finally did, "he said he was at home doing his taxes." (E-mail from Humanicki to Zawojski and Scholl of May 2, 2002, Pl.'s Vol. 2, at D0838.)

pleasure meeting [Anderson] on August 6, 2002," thanked Anderson for presenting an "overview" of the Chicago State store during the meeting, and commented that he looked forward to working with Anderson in the future. (Letter from Christopher to Anderson of August 14, 2002, Ex. D to Appx.) Although the letter contained the salutation "Dear Milton," one sentence addressed Anderson as "Eileen." (*Id.*) Anderson testified in his deposition that "Eileen" was the manager of a different store, and conceded that Christopher's reference to "Eileen" may have been a typographical error. (Def.'s 56.1 ¶ 60; Pl.'s Dep., at 187-88.)

## II.    The Alleged Comparators

Anderson contends that eleven white or Hispanic Follett Store Managers were similarly situated to him, but were treated more favorably: Khryss Holland, Jose Pizarro, David Tomalewicz, Greg Hartoonian, Mark Taylor, Jill Pawlaski, Walter Hughes, Chris Croson, Jeff Summers, Rebecca Birch, and Brenda Butler.[29] (Plaintiff's Memorandum in Opposition to Defendant Follett's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Resp."), at 8-10.) Each of these Store Managers, like Anderson, reported to Regional Manager Humanicki. (*Id.* at 8; Pl.'s 56.1 Addnl. ¶¶ 25-29.) Each managed either an A, B, B+,[30] C, or D level store at some point during the

---

[29]    In his LR 56.1 statement of additional facts, Anderson presents, in a section titled "Regional Manager, Theresa Humanicki's, Bookstore Managers Salary, Performance Ratings, and Financial Results Listing", a series of charts purporting to show salary, pay increases, and bonuses, as well as store sales, profit, and "shrink" levels, for twenty different Follett store managers in the years 2000-2003. (Pl.'s 56.1 Addnl. ¶¶ 25-29.) The charts also identify the race of the manager and his or her annual approval rating, and are grouped according to the sales level of the store (A, B+, B, C, and D). (*Id.*) Two of the managers, Brenda Robinson and Andrenne Farris, are black. Anderson provides no explanation of these charts—many of which contain blank fields—or their significance and relevance. In his brief, Anderson refers only to the eleven managers noted above in his discussion of similarly situated employees.

Follett does not dispute the accuracy of the data presented in Anderson's charts, which are, for the most part, supported by citation to the record. Although the court agrees with Follett that the charts do not comply with LR 56.1, the court considers the data presented in these charts where relevant and appropriate.

[30]    Neither party explains what a "B+" store is.

period from 2000 through 2003 (the "Time Period").[31]  (Pl.'s 56.1 Addnl. ¶¶ 25-29.)  The Chicago State bookstore was an "A" level store during Anderson's tenure there.  (*Id.* ¶¶ 1, 25.)

According to Follett, "[n]one of these other managers received written warnings or were put on probation for the same behavior as [Anderson]," and none were criticized, in performance appraisals from 2000-2003, "for the same level of performance deficiencies as [Anderson]."  (Def.'s 56.1 ¶ 68.)  Anderson denies this, citing performance issues with several of these managers.  (Pl.'s 56.1 Resp. ¶¶ 68-70; Pl.'s 56.1 Addnl. ¶¶ 17-18, 25-28.)   With regard to Holland, Pizarro, Tomalewicz, Hartoonian, Taylor, Pawlowski, and Hughes, Anderson identifies specific instances of misconduct and/or performance deficiencies, and the action Follett and/or Humanicki took in response.  With regard to Croson, Summers, Birch, and Butler, Anderson simply presents the financial results of the stores they managed; although he does not so state, Anderson presumably intends for the court to compare those results with his results at the Chicago State store.  The court addresses each alleged comparator in turn.

### A.    Khryss Holland

Holland, a white male, managed a "C" level store throughout the Time Period.  (Pl.'s 56.1 Addnl. ¶ 28.)  On March 14, 2003, Humanicki gave Holland a written "Last & Final Warning" for engaging in "inappropriate verbal behavior of a perceived sexual nature" with a store employee.  (Memo from Humanicki to Holland of March 14, 2003, Ex. 6 to Humanicki Dep., Pl.'s Vol. 1 Ex. J.)  The warning states that Holland's behavior was "in violation of [Follett's] Harassment Policy" and advises him that any further violation of that or any other Follett policy "will result in corrective action, up to and including the termination of your employment."  (*Id.*)  As Anderson points out, Follett policy provides that "[d]iscrimination against any employee or sexual harassment will result

---

[31]    Anderson does not provide actual dates of employment for these managers.  The court must thus infer that where Anderson provides salary information for an employee in a given year, that employee was employed by Follett at some point during that year.

in immediate termination", (Guidelines, Ex. 4 to Humanicki Dep., Pl.'s Vol. 1 Ex. J), but Holland was given a warning instead. (Pl.'s 56.1 Resp. ¶ 68.) Follett responds that Holland was warned "for exhibiting behavior that may have violated the policy, which does not require immediate termination under the policy." (Def.'s 56.1 Reply ¶ 68.) Follett cites to no evidence to support this assertion, and as the court reads the written warning, it does not indicate that Holland "may" have violated Follett's harassment policy; rather, as noted, it states that his behavior "*is* in violation of [Follett's] Harassment Policy," after an investigation "substantiated" the employee's allegations against him. (Memo from Humanicki to Holland of March 14, 2003, Ex. 6 to Humanicki Dep., Pl.'s Vol. 1 Ex. J (emphasis added).)

### B. Jose Pizarro

Pizarro, an Hispanic male, managed a "B+" level store in 2001, 2002, and 2003. (Pl.'s 56.1 Addnl. ¶ 26.) On May 7, 2003, Humanicki gave Pizarro a written warning for mismanagement of cash, specifically for failing to make daily bank deposits. (Memo from Humanicki to Pizarro of May 7, 2003, Pl.'s Vol. 2, at D0215.) The warning informed Pizarro that "further violations of company policy or procedure will result in additional corrective action, up to and including the termination of your employment with Follett." (*Id.* at D0216.) Anderson asserts that under Follett policy, "an employee who mishandles cash should be suspended or terminated" rather than receive a mere warning. (Pl.'s 56.1 Resp. ¶ 68.) Follett responds that Follett's policy provides that mishandling of cash can, not must, result in termination. (Def.'s 56.1 Reply ¶ 68.) In fact, the Guidelines state that an employee "suspected of any mishandling of cash . . . is to be suspended immediately", and that if an employee "mishandles cash . . . immediate termination can result." (Guidelines, Ex. 4 to Humanicki Dep., Pl.'s Vol. 1 Ex. J.) Pizarro was neither suspended nor terminated; in fact, at some point after 2003—the record does not reveal precisely when—he became Store Manager of the "A" level Chicago State store. (Humanicki Dep., at 43-44.)

## C.    David Tomalewicz

Tomalewicz, a white male, was classified as a "C" level manager in 2003.[32]  (Pl.'s 56.1

Addnl. ¶ 28.)  He had been removed as Store Manager at the New Trier High School bookstore in

November 2002 for performance issues, and although he was assigned to Lake Forest College for

a time afterwards, he had not been placed in another position with Follett as of June 2003.  (2003

Performance Appraisal for David Tomalewicz, Pl.'s Vol. 2, at D1278-80.)  He received a 2.67 on

his 2003 performance appraisal, in which Humanicki identified a number of performance problems:

> Dave has an understanding of the Follett Values, but needs to lead by example and
> expect the same of his store team.  Many times through out the past year, he has
> last [sic] and even missed deadlines.
> …
> The two areas that fell below standard were Labor Costs and A/R.  The labor costs
> were far over budget and was [sic] not managed weekly.  The A/R account were
> [sic] not set up immediately with no follow up.
> …
> The lack of training and development hurt the stores [sic] operations.  Colleagues
> did not [receive various training].
> …
> Dave needs to lead by example.  He did not often delegate to the right colleague
> and lack of follow up created serious problems.  Time management requires
> improvement.  Dave had a tendency to work hard and long hours, versus planning
> ahead and staffing properly.  At times, he ran the store in crisis mode.  The Fall
> Book Sale was a disaster from day one.
> …
> [Communication] is the area that shows at [sic] Dave's major weakness.  There was
> a lack of clear communication to his staff.  The demise of Dave's role as SM at New
> Trier HS was the lack of two way communication to the NTHS campuses.  Many
> times the administration would bring up issues to Dave versus he [sic] alerting the
> campus.  He would listen, but many times did not react.  Also, the communication
> to me was minimal, whether it be VM, e-mail or phone conversations.

(*Id.* at D1273-78.)  Although Tomalewicz was not terminated for his poor performance at New Trier,

Follett responds that he was "demoted" after "only one warning," which Follett claims provided "less

of an opportunity to improve than Regional Manager Humanicki afforded Anderson."  (Def.'s 56.1

Reply ¶ 68.)  Follett does not identify the "warning" that Tomalewicz allegedly received; indeed,

---

[32]     Anderson provides no salary, appraisal rating, or financial results for Tomalewicz
prior to 2003.

other than the material quoted above, the record contains no information with regard to Tomalewicz's removal from his position at New Trier, or his future with Follett. Anderson, in his charts of alleged comparators, provides only Tomalewicz's 2003 salary and appraisal rating, and provides no data regarding financial results of Tomalewicz's store(s), or any 2002 information.

### D. Greg Hartoonian

Hartoonian, a white male, managed a "B" level store in 2001 and 2002. (Pl.'s 56.1 Addnl. ¶ 27.) On Hartoonian's 2001 performance appraisal, he received a "standard" approval rating of 3.03, although Humanicki stated: "The textbook department which comprises about 80% of the store business was not adequately managed during this past year." (Pl.'s 56.1 Addnl. ¶¶ 17, 27.) Anderson, citing to Humanicki's deposition, asserts that Hartoonian in May 2002 "lost the store contract" at Illinois Institute of Technology ("IIT"). (*Id.* ¶ 18.) This assertion is unsupported. Humanicki in fact testified only that Follett no longer has a contract with IIT, and that Hartoonian was the manager when the store closed in May 2002, (Humanicki Dep., at 56); she did not explain why Follett lost the contract, and did not indicate that it was due to Hartoonian's performance.

As noted, Hartoonian interviewed for the Store Manager position at Chicago State after Anderson was terminated, but was not selected for the job. (Pl.'s 56.1 Addnl. ¶ 18.) When asked if he was rejected because he "lost a contract at IIT" or "was not a good manager", Humanicki testified, "I can't answer that." (Humanicki Dep., at 57.) The record does not contain an appraisal for Hartoonian for 2002 or any further employment information, and it is unclear whether he remained in Follett's employ after he was denied the Chicago State position.

### E. Mark Taylor

Taylor, a white male, managed a "B" level store throughout the Time Period. (Pl.'s 56.1 Addnl. ¶ 27.) On Taylor's 2001 performance appraisal, Humanicki commented that Taylor needed to improve paperwork organization and processing, noting that many invoices and receivables had not been timely processed and thus resulted in late fees. (*Id.* ¶ 17.) Taylor received a rating of 3.54

in 2001.  (*Id.* ¶ 27.)  In 2002, the "shrink" at Taylor's store was $46,082, or 3.8% of sales, and Taylor received a performance rating of 3.68.  (*Id.*)

On August 8, 2003, Humanicki issued a memo to Taylor regarding the high shrink level at his store after a store visit, warning him that non-compliance with procedures designed to reduce shrink would "result in additional corrective action."  (Def.'s 56.1 ¶ 70; Memo from Humanicki to Taylor of August 8, 2003, Pl.'s Vol. 2, at D0212-13.)  Taylor received a 3.66 on his 2003 appraisal.  (Pl.'s 56.1 Addnl. ¶ 27.)  The record contains no information regarding Taylor's performance after the August 2003 warning, or whether any "corrective action" was taken.

### F.    Jill Pawlowski

Pawlowski, a white female, managed a "B" level store throughout the Time Period.  (Pl.'s 56.1 Addnl. ¶ 27.)  Anderson asserts that Pawlowski had "performance issues" in 2001 but was not subject to any adverse action.  (*Id.* ¶¶ 17, 27.)  Specifically, in her 2001 performance appraisal, Pawlowski acknowledged that although she had reduced shrink by more than half, she was "not where the company expects me to be"; Humanicki observed that "profit was less than stellar with many issues contributing (high payroll, late fees, etc.)."  (*Id.* ¶ 17; 2001 Performance Appraisal for Jill Pawlowski, Pl.'s Vol. 2, at D1052, D1058.)  Pawlowski's store posted a profit of $59,639 in 2001, missing the budgeted goal of $86,186, and had $28,000 of shrink, representing 2.2% of sales; she received an appraisal rating of 3.35.  (Pl.'s 56.1 Addnl. ¶ 27.)  In 2002, the store posted a profit of $94,594, exceeding the budgeted goal of $48,425, with $32,048 of shrink, again representing 2.2% of sales; Humanicki gave Pawlowski a rating of 3.95.

### G.    Walter Hughes

Hughes, a white male, managed a "C" level store.[33]  (Def.'s 56.1 ¶ 69.)  On his 2001

---

[33]    Anderson asserts that Hughes managed a "D" level store, but cites only to Hughes' 2001 Performance Appraisal, which provides no support for this assertion.  (Pl.'s 56.1 Resp. ¶ 69.) Although Anderson provides salary information for Hughes for 2000-2003, he provides financial results only for 2001.  (Pl.'s 56.1 Addnl. ¶ 29.)

performance appraisal, Humanicki stated: "I would like to see [Hughes] utilize e-mail to communicate to me." (2001 Performance Appraisal for Walter Hughes, Pl.'s Vol. 2, at D0286.) On February 3, 2003, Humanicki issued a memo to Hughes after a store visit, informing him that the store was "non-compliant in many areas," including the textbook department, accounts receivable, and general paperwork followup. (Memo from Humanicki to Hughes of February 3, 2003, Pl.'s Vol. 2, at D0208-11.) Hughes' performance rating for 2003 was 2.64; Humanicki noted that Hughes had been on leave since March 2003, would be on long-term disability indefinitely, and would not return as the Store Manager. (2003 Performance Appraisal for Walter Hughes, Pl.'s Vol. 2, at D0280, D0285.)

### H. The "Financial Results" Comparators: Croson, Summers, Birch, and Butler

With respect to the remaining comparators, Anderson, as noted, merely provides financial results for their stores. (Pl.'s 56.1 Addnl. ¶¶ 25-29.) With the exception of Croson, the record does not indicate that Follett took any action against these comparators. As Anderson includes himself in the list of alleged comparators, the court presumes that Anderson is inviting a comparison with the financial results of the Chicago State store when he was the Store Manager there, to create the inference that he was treated harshly despite achieving allegedly superior results. The court thus presents his financial results for 2001 and 2002—Anderson provides no information for 2000, his first year at Chicago State—followed by those of the remaining comparators.

#### 1. Anderson

The Chicago State store, as noted, was an "A" level store. In 2001, the store had sales of $3,027,539, missing the budgeted goal of $3,205,494, and the store's actual profit of $80,723 missed the budgeted goal of $237,539. (Pl.'s 56.1 Addnl. ¶ 25.) Shrink was $167,982, or 5.5% of sales. (*Id.*) Humanicki, as noted, called these results "unacceptable" in Anderson's 2001 performance appraisal, and rated him a 2.00 (out of 5) in "Financial Soundness/Accountabilities". (2001 Performance Appraisal, Ex. R to Appx., at 4.)

In 2002, the store's sales of $3,241,740 exceeded the budgeted sales goal of $3,221,898, but actual profit of $192,728 missed the (increased from 2001) budgeted profit goal of $246,217. (*Id.*) Shrink declined steeply to $11,616, or .36% of sales. (*Id.* ¶ 25.) Despite the higher sales and the dramatic decrease in shrink, Humanicki, without explanation, maintained her 2.00 rating in Anderson's 2002 performance appraisal in the "Financial Soundness/Accountabilities" category. (2002 Performance Appraisal, Ex. S to Appx., at 5.)

### 2. Chris Croson

Croson, a white male, managed an "A" level store in 2002 and 2003. (Pl.'s 56.1 Addnl. ¶ 25.) In 2002, the store had a budgeted sales goal of $3,245,811 and actual sales of $3,002,119; missed its profit goal of $9,567 by posting a $93,345 loss; and had $148,271 of shrink, or 4.9% of sales. (*Id.*) Croson nevertheless received a "standard" rating of 3.34 on his 2002 performance appraisal, with a 3.00 in the "Financial Soundness/Accountabilities" category. (*Id.*; 2002 Performance Appraisal for Chris Croson, Pl.'s Vol. 2, at D0237.) In 2003, Croson's store lost $363,760 despite a budgeted goal of only $6,447, and shrink increased to $231,214, or 6.5% of sales of $3,563,434. (Pl.'s 56.1 Addnl. ¶ 25.) Humanicki labeled these results "unsatisfactory" and "abysmal" in Croson's 2003 performance appraisal, issuing a "below standard" overall rating of 2.53; Anderson has not provided the court with the portion of Croson's 2003 performance appraisal that would indicate Croson's score in the particular financial-results category. (2003 Performance Appraisal for Chris Croson, Pl.'s Vol. 2, at D0221, 228.)

Croson was terminated on July 22, 2003. (Def.'s 56.1 ¶ 67.) The record does not reveal the reason for his termination; when asked in her deposition whether it was for poor financial results, Zawojski testified that she was unable to recall. (Zawojski Dep., at 47-48.) Humanicki was not asked in her deposition why Croson was terminated.

### 3. Jeff Summers

Summers, a white male, managed a "B" level store throughout the Time Period. (Pl.'s 56.1

Addnl. ¶ 27.)  In 2001, his store was budgeted for a profit of $41,959, yet posted a loss of $20,405; sales of $1,278,064 missed the budgeted goal of $1,310,220.  (*Id.*)  In 2002, budgeted profit was $48,568 but the store lost $15,920, and sales of $1,305,625 missed the goal of $1,349,972.  (*Id.*)  Shrink decreased from $82,858 in 2001 to $40,934 in 2002.  (*Id.*)  He received an overall rating of 3.39 from Humanicki in 2001, with a 3.00 in the "Financial Soundness/Accountabilities" category, (2001 Performance Appraisal for Jeff Summers, Pl.'s Vol. 2, at D0321), and a 3.6 overall rating in 2002, with the same 3.00 rating in the financial category.  (2002 Performance Appraisal for Jeff Summers, Pl.'s Vol. 2, at D0314.)  In 2003, Summers's store met its sales goal, had no shrink due to "overage", but again posted a loss, of $7,050.  (Pl.'s 56.1 Addnl. ¶ 27.)  Despite the store's failure to post a profit for three straight years, Humanicki gave Summers an "above standard" rating of 3.75 in 2003; once again, the record does not contain his specific score for the financial results category. (2003 Performance Appraisal for Jeff Summers, Pl.'s Vol. 2, at D0291, 297.)

### 4.  Rebecca Birch

Birch, a white female, managed an "A" level store in 2001 and 2002.  (Pl.'s 56.1 Addnl. ¶ 25.)  In 2001, her store exceeded both budgeted sales and profit goals.  (*Id.*)  Anderson asserts that in 2002, the store missed the budgeted sales goal of $3,970,060 by posting sales of $3,486,786, although Anderson's figures also show that the store exceeded the budgeted profit goal and that shrink in 2002 was a mere $6,003, or .17% of sales.  (*Id.*)  Anderson further asserts that Birch received a 3.64 appraisal rating in 2002.  (*Id.*)  To support these assertions, however, Anderson cites to documents, identified only by Bates numbers, which appear to be missing from the materials he submitted to the court.  In any event, it is undisputed that Birch's store had higher sales in 2002 than Anderson's store at Chicago State.  (Def.'s 56.1 ¶ 69; Pl.'s Dep., at 214.)

### 5.  Brenda Butler

Butler, a white female, managed a "B" level store from 2001 through 2003.  (Pl.'s 56.1 Addnl. ¶ 27.)  Anderson asserts that her store had $24,000 in shrink in 2002, but provides no other

financial results, such as sales or profits, for that or any year. (*Id.*) Moreover, the materials he cites to in support of his shrink level assertion do not appear in the materials he has provided.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court construes the facts and draws all reasonable inferences in the light most favorable to the party opposing summary judgment.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The court is not, however, required to "'draw every conceivable inference from the record,'" and inferences supported only by speculation or conjecture will not defeat a summary judgment motion.  *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)).

### II.     Race Discrimination

Anderson contends that he was terminated on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, and 42 U.S.C. § 1981.  Title VII and § 1981 claims of race discrimination are both analyzed under the same framework.  *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999).  To establish a claim in response to a motion for summary judgment, a plaintiff may proceed under either the "direct" or the "indirect" (burden-shifting) method of proving discrimination.  *See Thanongsinh v. Board of Educ.*, 462 F.3d 762, 772 (7th Cir. 2006).

A plaintiff proceeding under the direct method must present either direct or circumstantial evidence that an employer's decision had a discriminatory motivation.  *Ptasthe v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006) (internal citations omitted).  "'Direct' evidence of

discrimination is 'evidence which in and of itself suggests that someone with managerial authority was animated by an illegal employment criterion.'" *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 394 (7th Cir. 2005) (quoting *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999)) (internal quotation marks omitted). In an employment case, this "essentially requires an admission" by the employer that an employment decision was based on an unlawful animus. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence, in contrast, is that which supports an inference of discriminatory intent, including "'suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Walker*, 410 F.3d at 394 (quoting *Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994)). Such evidence must, however, amount to a "convincing mosaic of discrimination against the plaintiff." *Id.* (quoting *Troupe*, 20 F.3d at 737).

Under the familiar indirect, or "burden-shifting" method, a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the class were treated more favorably. *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the plaintiff's evidence is sufficient for a reasonable jury to find a prima facie case of unlawful discrimination, then the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Sun v. Board of Trustees of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007); *Ptaskznik*, 464 F.3d at 696. If the defendant does so, the plaintiff must prove that the defendant's explanation was pretextual. *Ptaskznik*, 464 F.3d at 696.

Anderson devotes most of his brief in response to Follett's motion for summary judgment to establishing a claim of discrimination under the indirect, burden-shifting method. He does,

however, also contend that he has "Direct Evidence" of racial discrimination. (Pl.'s Resp., at 4.) Accordingly, the court considers Anderson's claims under both the direct and indirect methods.

## A. The Direct Method

Follett argues that Anderson cannot establish a prima facie case of race discrimination under the direct method. (Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem."), at 3.) The court agrees. The only evidence Anderson offers in support of this method are the comments he claims Bob Scholl made to him during Anderson's tenure at Virginia State, and the "thank-you" letter he received from Tom Christopher in August 2002 that referred to him as "Eileen." (Pl.'s Resp., at 4.) Neither Scholl's comments nor Christopher's letter constitute direct or circumstantial evidence of discriminatory intent.

According to Anderson, Scholl told him, sometime in 1999, "I don't care how long you have been with the company; if you're not performing you will be fired." (Def.'s 56.1 ¶ 25; Pl.'s 56.1 Resp. ¶ 25.) On another occasion, Scholl told Anderson to "get his ass into the meeting," and on yet another occasion told Anderson not to be late. (Def.'s 56.1 ¶ 27.) These comments make no mention of race; indeed, in his deposition, Anderson testified that he never heard Scholl make any comments about his race or the race of anyone else. (*Id.*; Pl.'s Dep., at 125, 186.) Nor does Christopher's letter even remotely refer to race. The letter, addressed to "Milton," states that it had been a pleasure meeting him on a recent store visit, but thanks "Eileen" for having given him an overview of the Chicago State store. (Letter from Christopher to Anderson of August 14, 2002, Ex. D to Appx.) Because neither piece of evidence in and of itself suggests a racial motivation for Anderson's termination, Scholl's comments and Christopher's letter cannot constitute "direct evidence" of discriminatory intent. *See Walker*, 410 F.3d at 394; *see also Trask v. General Elec. Co.*, 207 F. Supp. 2d 843, 845-46 (N.D. Ill. 2002) (supervisor's comment "you sure may be in trouble" did not constitute direct evidence of discrimination because it was not "'evidence which in and of itself suggests' that someone with managerial authority was 'animated by an illegal

33

employment criterion'") (quoting *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997)).

Nor has Anderson presented sufficient circumstantial evidence of an unlawful animus. Anderson maintains that Scholl's comments and Christopher's letter were "racist in context", (Pl.'s Resp., at 4), but he fails to present any evidence regarding the context of these communications which could create a basis for such an inference. On their face, Scholl's statements appear to be nothing more than harsh reminders that Anderson must do his job. Christopher's letter similarly has no racial overtone. The reference to "Eileen" cannot reasonably be construed as anything other than a typo, and Anderson conceded in his deposition that this may have been the case. (Pl.'s Dep., at 187-88.) Anderson does not point to any other "ambiguous statements," suspicious treatment of other black employees, or any other evidence, the totality of which could support an inference of discriminatory intent.[34] *See Walker*, 410 F.3d at 394. Because the evidence thus does not establish a "convincing mosaic" of race discrimination, *see id.*, his claims cannot survive summary judgment under the direct method.

---

[34]      Anderson asserts, as "direct evidence" of discrimination, that Christopher told Humanicki "that the Plaintiff lacked leadership and pride." (Pl.'s Resp., at 4.) Anderson's citation to an e-mail from Humanicki to Zawojski and Scholl dated August 9, 2002 does not support this assertion. In that e-mail, Humanicki, recounting a visit to the Chicago State store with Christopher, Pribyl, and Scholl, wrote:

> It was very apparent to [Christopher] and [Pribyl] that [Anderson] lacked leadership and pride in the store. Quite frankly, it was an embarrassment to walk into the store and see Milton shabbily dressed as well as unprepared for the visit. I did forewarn both [Christopher] and [Pribyl] of this [sic] performance issues and where we stood in the performance counseling.

(E-mail from Humanicki to Zawojski and Scholl of Aug. 9, 2002, Pl.'s Vol. 2, at D0831.) The e-mail thus does not support an assertion that Christopher in fact told Humanicki that Anderson "lacked leadership and pride"; rather, this appears to be Humanicki's characterization of how Anderson presented himself. In any event, nothing about the alleged remark suggests racial overtones.

Anderson also contends that he "felt hurt and emasculated being called by a woman's name" in Christopher's letter. (Pl.'s Resp., at 4; Pl.'s 56.1 Resp. ¶ 60.) This feeling, if truly held, nonetheless provides no inference of racial bias on Christopher's part.

B.    **The Indirect Method**

1.    **Prima Facie Case**

As noted, the indirect method requires Anderson first to establish a prima facie case of discrimination, by showing that he is a member of a protected class, was meeting his employer's legitimate expectations, was subjected to an adverse employment action, and that similarly situated coworkers who were not members of his protected class received more favorable treatment.  *See Ptaskznik*, 464 F.3d at 696.  It is undisputed that Anderson is a member of a protected class and that he suffered an adverse employment action when he was terminated.[35]  The parties disagree as to whether Anderson has shown that similarly situated white employees were treated more favorably, and as to whether he was meeting Follett's legitimate expectations.  (Def.'s Mem., at 5-7.)  As discussed below, the court finds that Anderson has met his burden of establishing these two elements of his prima facie case.

a.    **Similarly Situated Employees**

To demonstrate that he was treated less favorably than similarly situated employees outside his protected class, Anderson must identify an employee who was "directly comparable to [him] in all material respects."  *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).  Specifically, a

---

[35]    Anderson also contends that he suffered adverse employment actions apart from his termination, including that he received "threatening" e-mails containing "character assassination"; that his store budgets were set higher than those of other managers; that Humanicki questioned Chicago State employees about him, made him redo his employees' performance appraisals, and had the store audited while Anderson was on vacation; that Christopher's above-noted "Eileen" reference constituted "insult"; that he "was under constant surveillance" by Humanicki because she once visited the store three times in one week; that he received the April 2001 Warning; and that he was placed on probation despite the fact that Follett does not have a specific 90-day probation policy.  (Pl.'s Resp., at 5-7.)  Because Anderson's termination suffices to satisfy his burden of showing an adverse employment action for his race discrimination claim, the court need not determine at this time the extent to which these allegations are supported by the record, or whether they do indeed rise to the level of adverse employment actions.  *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003).  The court will address these other claimed adverse employment actions when discussing his retaliation claim.

plaintiff who contends that he was disciplined more harshly than similarly situated employees must show that he was similarly situated with regard to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. It is not enough to identify an employee with a similar position and responsibilities; rather, the plaintiff must show that the other employee had a "'comparable set of failings.'" *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (quoting *Haywood v. Lucent Techs.*, 323 F.3d 524, 530 (7th Cir. 2003)).

In *Burks*, the plaintiff was terminated for, *inter alia*, missing deadlines, lack of initiative in completing job duties, and failing to follow directions. *Id.* at 749. She and a co-worker had similar positions in which they completed the same type of work, used the same computer program, and took meeting notes in the same manner; yet only the plaintiff was reprimanded for her note-taking style. *Id.* at 748-49, 751. The plaintiff did not allege that her co-worker shared in her other alleged shortcomings, such as failing to meet deadlines or to follow directions, or had similar performance reviews. *Id.* at 751-52. Because the co-worker thus did not have a "comparable set of failings," the Seventh Circuit held that she and the plaintiff were not similarly situated. *Id.* at 752; *see also Haywood*, 323 F.3d at 530 (two white employees who had received (low) performance ratings similar to plaintiff's but had allegedly received more favorable treatment were not similarly situated because plaintiff had been terminated for inability to accept and act on feedback, a troubled relationship with management, and insubordination; plaintiff presented no evidence that the white employees had "a comparable set of failings").

The identified employee need not have engaged in identical conduct, however. *See Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005). In *Goodwin v. Bd. of Trustees of Univ. of Ill.*, 442 F.3d 611 (7th Cir. 2006), the plaintiff, a black female building services foreman, was demoted as

the result of an incident where she had allegedly shown a vulgar e-mail image to other employees, was reprimanded, and then threatened retaliation against one of the employees under her supervision for possibly informing her supervisors that he had seen the picture. *Id.* at 615-16. The plaintiff identified, as a similarly situated employee, a white male foreman who had thrown a bottle cap at a female foreman and told her to "shove it up [her] ass," but who had received a written warning rather than a demotion. *Id.* at 619. Although the situations were not identical, the court found them sufficiently similar for the white foreman to be similarly situated: his conduct was "both vulgar and potentially threatening, which is the essence of the charges against [the plaintiff]." *Id.*

Anderson first identifies two Store Managers who engaged in misconduct, but who Anderson claims were more leniently disciplined: Holland, a white male who received a written warning for sexual harassment in violation of Follett policy; and Pizarro, an Hispanic male who received a written warning for mishandling cash. (Pl.'s Resp., at 8-9.) As Anderson correctly points out, each, according to Follett policy, should have received harsher discipline: the Guidelines state that "sexual harassment will result in immediate termination[,]" and provide that an employee "suspected of any mishandling of cash . . . is to be suspended immediately." (Guidelines, Ex. 4 to Humanicki Dep., Pl.'s Vol. 1 Ex. J.) Holland was not terminated and Pizarro was not suspended. Anderson has not, however, shown that he engaged in similar misconduct. None of his written warnings, performance appraisals, and notices of termination and probation cite performance issues similar to sexual harassment or the mishandling of cash, *cf. Goodwin*, 442 F.3d 619, and nothing in the record indicates that Holland and Pizarro were ever cited for performance problems similar to Anderson's.[36]

---

[36] The court notes that sexual harassment and cash mismanagement arguably are more egregious types of misconduct than the deficiencies in Anderson's performance. Nonetheless, for purposes of determining whether other employees were similarly situated, the relevant inquiry is whether they were treated more leniently for *similar* behavior. *See Radue*, 219 F.3d at 617-18. The fact that other employees were less severely disciplined for arguably more egregious behavior is relevant to the issue of pretext, however, as will be discussed.

Anderson next, and more successfully, proffers Tomalewicz, who Anderson contends "was documented for the same unacceptable performances" for which Anderson was terminated, but remained employed by Follett. (Pl.'s Resp., at 9.) Tomalewicz's misconduct indeed appears quite similar to Anderson's. In his 2003 performance appraisal, Humanicki cited Tomalewicz for missed deadlines, inadequate supervision of employees and delegation of tasks, and a lack of communication with his staff, the New Trier campus, and Humanicki herself. (2003 Performance Appraisal for David Tomalewicz, Pl.'s Vol. 2, at D1273-78.) Anderson's probation notice similarly identified problems in communicating with his staff, the campus, and Humanicki, and in his leadership and handling of subordinates; and the June 2002 Warning cited, *inter alia*, missed deadlines and conference calls, and problems addressing performance issues among his staff.

Follett does not confront these similarities in misconduct, but rather denies that Tomalewicz was treated any more favorably because he was "given only one warning" before his removal from New Trier; Follett contends that because Anderson received multiple warnings, he was given more opportunities to improve. (Def.'s Mem., at 9.) This argument misses the point, for Anderson ultimately was terminated while Tomalewicz remained employed. In fact, it appears that Follett provided Tomalewicz with opportunity not afforded to Anderson: following Tomalewicz's removal from New Trier, he was "assigned to Lake Forest College as well as helping throughout the region." (2003 Performance Appraisal for David Tomalewicz, Pl.'s Vol. 2, at D1279-80.)

Follett has not argued that Tomalewicz was dissimilar to Anderson in other ways—performance or attendance, for example. Nor does Anderson provide any information about Tomalewicz's level of experience, length of employment, or the financial performance of the New Trier store. In the court's view, however, any differences on these issues do not preclude the two employees from sharing "a comparable set of failings." *Cf. Burks*, 464 F.3d at 751 (co-workers shared none of plaintiff's cited performance issues). Anderson has thus made a sufficient prima facie showing that Tomalewicz was a similarly situated employee who received more favorable

treatment.

Anderson's remaining comparators do not qualify as similarly situated. Anderson identifies four Store Managers who he claims demonstrated performance deficiencies similar to his own, and/or achieved weaker financial results in certain respects: Hartoonian, who "lost the store contract" at IIT and posted a "negative profit" in 2001, but who interviewed for the Chicago State position after Anderson's termination; Taylor, whose store had higher shrink and lower sales than Anderson's store in 2002, and whom Humanicki cited in 2001 for deficient paperwork and in 2003 for non-compliance with policies designed to reduce shrink; Pawlowski, who missed her budgeted profit goal in 2001, acknowledged that she had not reduced shrink as much as was expected of her, and posted lower sales and higher shrink than Anderson in 2002; and Hughes, whom Humanicki in 2001 asked to increase his use of e-mail. Anderson finally identifies four purported comparators solely on the basis of their stores' financial results: Croson, who in 2002 had large shrink and missed both budgeted sales and profit goals; Summers, who in 2002 had lower sales and higher shrink than Anderson, and never posted a profit in either 2001, 2002, or 2003; Birch, who missed her budgeted sales goal in 2002; and Butler, who Anderson asserts had higher shrink in 2002. Anderson contrasts these results with his own 2002 results: the Chicago State store's sales exceed the budgeted goal, profits more than doubled from 2001, and shrink was a mere .36% of sales. (Pl.'s Resp., at 9-10; Pl.'s 56.1 Addnl. ¶¶ 17-18, 25-29.)

The specific performance deficiencies Anderson relies on in his comparisons to Hartoonian, Taylor, Pawlowski and Hughes fail to provide a basis for finding them similarly situated. Hughes and Taylor, unlike Tomalewicz, were cited in passing for only one or two of the performance issues for which Anderson was cited; this, without more, does not show that they had a "comparable set of failings." Hartoonian's alleged "losing" the IIT contract is not only dissimilar to any of Anderson's specific performance issues, but Hartoonian's subsequent interview for the Chicago State position was unsuccessful. Anderson's sole remaining basis for comparison with these Store Managers,

as with Croson, Summers, Birch, and Butler, is that he allegedly outperformed them financially.

Anderson's attempt to identify similarly situated employees on the basis of allegedly superior financial performance in certain areas fails for several reasons. First, several of the benchmarks he uses for his financial comparisons are misleading. As Follett points out, the fact that he had "higher sales" in 2002 than Butler, Summers, Pawlowski, and Taylor, (Pl.'s Resp., at 9), is irrelevant because they managed "B" level stores, whereas the Chicago State store was an "A" level store which by definition would have higher sales volume. The only relevant comparison on the basis of pure sales volume would be to "A" level managers Croson and Birch, and neither comparison is favorable to Anderson. Although Birch failed to meet her budgeted sales goal in 2002, and Anderson exceeded his, every other benchmark comes out in Birch's favor: she beat both sales and profit goals in 2001, while Anderson missed both; Birch beat her profit goals in 2002, and Anderson did not; Birch's shrink was a mere .17% of sales; and total sales volume at Birch's store in 2002 exceeded sales volume at Anderson's. Croson's performance is irrelevant because he was terminated; thus, Anderson cannot argue that Croson received more lenient treatment. In addition, Anderson's assertion of superior profits in 2001 and 2002 is weakened by the fact that he missed his budgeted profit goals both years.

More importantly, Anderson was not terminated for poor financial performance at Chicago State. Neither Anderson's notice of probation in June 2002 nor his notice of termination in September 2002 referred to financial performance. Anderson's comparisons with the financial results of other managers' stores, without a showing that the other managers shared the performance issues cited in Anderson's warnings and notices of probation and termination, thus misses the mark for purposes of establishing similarly situated employees. Some of these comparisons may be relevant to the issue of pretext, discussed below; but at this stage, of Anderson's purported comparators, only Tomalewicz qualifies as similarly situated.

### b.      Legitimate Employment Expectations

Anderson maintains that he was meeting Follett's legitimate expectations when he was terminated.  He characterizes himself as an "exceptional employee" during his nineteen years with Follett, particularly because while managing the Chicago State store in 2002 he exceeded the budgeted sales goal, increased profit from 2001, and dramatically reduced shrink.  (Pl.'s Resp., at 4.)  He also highlights certain aspects of his performance during his tenure at the Virginia State store, including that he achieved the second highest profit increase in the region, and that he received a letter of recommendation from his campus contact there.  (*Id.* at 5.)  Follett responds with a long list of performance problems, most of them non-financial, going back to Anderson's time in Virginia.  (Def.'s Mem., at 5.)   Anderson admitted to most of these performance issues in his deposition: he testified that while at Virginia State, he had problems satisfactorily completing his required paperwork, incurred late fees from vendors, did not develop employees in key positions, and his store was occasionally messy, (Def.'s 56.1 ¶¶ 29, 35; Pl.'s Dep., at 87-89, 146-48); and that at Chicago State he did not complete paperwork in a timely manner, was not always present when needed on the sales floor, may have worn ripped clothing at work, dozed off while working, missed deadlines and conference calls, failed to discipline employees, confronted Stoll over security measures, had account receivables that were past due, and failed to follow call-in procedures when absent from work.  (Def.'s 56.1 ¶¶ 46-49; Pl.'s Dep., at 150-51, 201, 171-74, 179.)

Anderson's performance at Virginia State is not relevant to whether he was meeting Follett's expectations when he was terminated.  *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002) (whether employee met legitimate expectations assessed at time of adverse employment action).  His performance problems at Chicago State are indeed relevant, and many are undisputed; but the court is unwilling to disregard the financial performance of that store during Anderson's tenure as its manager.  While the store's profit of $192,728 in 2002 may have missed the budgeted goal of $246,217, it still marked a substantial increase from the 2001 profit

of $80,723.  Sales of over $3.2 million in 2002 exceeded both the budgeted goal and the previous year's sales of approximately $3 million.  Shrink decreased from 5.6% of sales in 2001 to a mere .36% of sales in 2002.  Vaughan testified in her deposition that it is "a goal to reduce shrink," (Vaughan Dep., at 41), and Zawojski testified that "it is the expectation that stores would make a profit."  (Zawojski Dep., at 26.)  Anderson succeeded on both fronts.

Follett points out that a particular bookstore's profit, sales, or level of shrink can be affected by factors outside the Store Manager's control and unique to a store's campus, such as pricing levels, student enrollment, or security measures.[37]  (Defendant's Reply Memorandum in Support of Its Motion for Summary Judgment ("Def.'s Reply"), at 4.)  There is no evidence that these factors actually existed at Chicago State and influenced Anderson's results, however.  Follett also notes that financial performance was only one of four categories by which mangers were evaluated, and that Anderson's performance issues arose in other categories.  Viewing the evidence in the light most favorable to Anderson for purposes of this motion, however, Anderson's 2002 financial performance raises a triable issue as to whether he was meeting Follett's legitimate expectations.

Furthermore, the court notes that, according to Follett, Anderson's non-financial performance issues date back to his tenure at Virginia and even at Roosevelt.  The fact that Follett tolerated these shortcomings for so many years casts doubt on the notion that they required his discharge.  Indeed, given that Anderson's transfers to Virginia and to Chicago constituted promotions, Follett arguably rewarded Anderson's performance despite the presence of the same performance issues it now characterizes as offenses warranting termination.

The court concludes that Anderson has met his burden of making a prima facie showing.

---

[37]     Croson's store at Southern Illinois University, for example, came under Follett's control via a court-supervised bankruptcy proceeding that controlled many aspects of its operations, including payroll and salaries.  (Humanicki Dep., at 62-64.)

### 2.     Pretext

Anderson must show that Follett's articulated, non-discriminatory reason for terminating him—his failure to meet the six performance objectives Humanicki had identified during the probationary period—is a pretext.  *See Ptaskznik*, 464 F.3d at 696.  Proving pretext "requires more than showing that the decision was 'mistaken, ill considered or foolish, [and] so long as [the employer] honestly believes those reasons, pretext has not been shown.'"  *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).  Anderson must thus produce "evidence from which a fact-finder could infer that the employer lied about the reasons for its adverse employment action."  *Bell v. EPA*, 232 F.3d 546, 551 (7th Cir. 2000).  Follett contends that no such evidence exists.  The court, however, finds that the record reveals several troublesome inconsistencies in the way Follett dealt with Anderson as compared to other employees, as well as other evidence which raises questions that Follett fails to adequately address.   Specifically, the court notes the fact that Holland and Pizarro were disciplined less severely than was called for under Follett Guidelines; inconsistencies in, and questions raised by, Anderson's June 2002 performance evaluation, including that Humanicki inexplicably retained her low ratings for Anderson in the financial performance category, despite his improved results; the fact that Humanicki had already expressed her desire to terminate Anderson before putting him on performance probation; and the fact that the criteria by which Anderson was judged in the probationary period were entirely subjective and could be met only if Humanicki so determined.  In the court's view, the cumulative effect of this evidence is sufficient to establish that Follett's stated reason for terminating Anderson was pretextual.

As noted earlier, Holland, a white male, received a written warning for sexual harassment, even though, according to the Guidelines, that violation should have resulted in his "immediate termination."  Follett's explanation for its decision not to terminate Holland—that he was warned for behavior that only "may" have violated Follett's sexual harassment policy—is unsupported by the

43

evidence, as Holland's written warning states that his behavior "is" in violation of that policy, after an investigation that had "substantiated" the allegations of harassment. Similarly, Pizarro, an Hispanic male who received a written warning for mishandling cash, should have been suspended under the Guidelines, but was not. Follett attempts to address this inconsistency by pointing out that under the Guidelines, Follett had discretion whether to terminate Pizarro. Still, the fact that two employees outside Anderson's protected class engaged in arguably more egregious conduct than he did, yet received more lenient discipline than was mandated by Follett's own disciplinary rules, casts some doubt on Follett's explanation that Anderson's performance issues were so severe as to warrant his termination.

Anderson's June 2002 performance appraisal, contemporaneous with Follett's decision to place him on performance probation, is troublesome in several respects. First, Follett fails to explain why Humanicki waited more than a year since Anderson's last performance review in May 2001 and the April 2001 Warning, given that those appraisals expressed strong concerns about several aspects of his performance. The only reference in the June 2002 appraisal to those earlier reviews appears in a section labeled "comments on objectives," which states that Anderson "showed improvement shortly after the [April 2001] counseling and review, but still continues to struggle without follow [sic] and direction." (2002 Performance Appraisal, Ex. S to Appx., at 5.) Humanicki also noted in the June 2002 appraisal that Anderson had "a tendency to avoid confrontation" with his employees—a comment somewhat at odds with her characterization of Anderson as "disrespectable [sic]" to his colleagues. (*Id.* at 2-3.) Finally, Humanicki noted without comment the financial results Anderson had achieved in 2002, which reflected the more than doubling of profits from 2001, sales that exceeded the budgeted amount, and a steep decline in shrink; yet she maintained the same 2.00 rating as in 2001 in the "Financial Soundness/Accountabilities" category. (*Id.* at 4.) Croson's store, in contrast, missed its budgeted sales goal in 2002, posted a loss, and had shrink of 4.9% of sales, compared to Anderson's .36%

showing; yet Humanicki rated Croson a 3.00 in the "Financial Soundness/Accountabilities" category. Summers' store missed sales goals and posted losses in both 2001 and 2002, yet he also received in 3.00 in the financial category in both years. The court finds troubling Humanicki's exclusive focus on non-financial aspects of Anderson's performance, and her failure to give credit where credit was due, in light of the higher ratings given to white managers who achieved significantly weaker results.

The evidence further suggests that the decision to place Anderson on probation might not have represented a good-faith effort to work with Anderson to improve his performance. As noted, Humanicki indicated in the June 2002 performance appraisal that Anderson had showed some improvement after the April 2001 Warning. Yet without any intervening review, Humanicki had apparently decided by May 2, 2002 that she wanted to terminate him: in an e-mail to Zawojski and Scholl on that date, noting incidents that had occurred within the previous one or two months, she asked for "help in guiding me in order to terminate him." (E-mail from Humanicki to Zawojski and Scholl of May 2, 2002, Pl.'s Vol. 2, at D0837.) After Zawojski and Scholl advised performance probation rather than termination, it appears that Humanicki was not even willing to give Anderson the full ninety days of probation: in an August 2002 e-mail, she noted that sixty days had elapsed, opined that Anderson had showed little improvement, and asked if Follett should "cut him loose now[.]" (E-mail from Humanicki to Zawojski and Scholl of August 9, 2002, Pl.'s Vol. 2, at D0831.) These comments support an inference that Follett may have placed Anderson on probation in an attempt merely to "cover its bases" in the course of a pre-ordained decision to terminate him.

This inference finds further support in the fact that probation may not be a common disciplinary practice at Follett. The Guidelines do not explicitly provide for performance probation; rather, that document provides for documented "counseling sessions" addressing "specific ways to improve performance" and a "deadline for improvement." (Guidelines, Ex. 4 to Humanicki Dep., Pl.'s Vol. 1 Ex. J.) According to Humanicki, a "probationary period is generally used as part of

progressive discipline." (Humanicki Dep., at 32.)  The record does not show that any Store Manager apart from Anderson was ever placed on performance probation, however.  In her deposition, Zawojski was asked to provide "racial profiles" of other managers in Humanicki's region who had been placed on performance probation "similar to that received by [Anderson]" between 2000 and 2003.  (Zawojski Dep., at 19.)  She answered that she did not "have those committed to memory"; when subsequently asked if she could remember "any such incidents," she answered that she could not "recall specific names."  (*Id.*)  Although she did not directly testify that no other Store Manager had been placed on probation in Humanicki's region for similar performance issues, this exchange, construed in the light most favorable to Anderson, supports such an inference.

Finally, the subjective nature of Humanicki's complaints about Anderson, which were further reflected in the performance objectives outlined in the probationary notice, suggests that Anderson may have been set up to fail.  Humanicki's written appraisals cite issues such as Anderson's lack of "presence" and "leadership" on the sales floor, his "lack of professionalism", "lack of urgency" in responding to Humanicki's directives, and "disrespect" shown towards others.  (April 2001 Warning, Ex. Q to Appx.; 2002 Performance Appraisal, Ex. S to Appx., at 5.)  The areas of improvement outlined in his probationary notice similarly included "[c]ommunicating in a cooperative, thorough and effective manner," "[p]roviding leadership and working as a team player," "[u]pholding . . . Follett's People First philosophy," and "[a]ddressing colleague performance issues." (Performance Probation Notice, Ex. T to Appx.)  None of these criteria are readily quantifiable.  Anderson could demonstrate improvement in these areas only if Humanicki, in her wholly subjective view, determined that he had; and, as noted, Humanicki had by then made known her desire to fire him.

The notice of probation did contain several specific directives: Anderson was to send an agenda and recap of weekly staff meetings to Humanicki, ensure that a cashier or manager was supervising the sales floor at all times, report to work on time, rewrite performance reviews for seven employees, and "review" the results of a March 2002 audit and "send recap out [sic] Audit

Action Plan that will be implemented." (*Id.*) Anderson's termination notice, however, except for noting that he had not completed the "Audit Action Plan," contains no indication that Anderson failed to execute these specific tasks. Indeed, Humanicki wrote in the termination notice that Anderson had in fact sent the meeting agendas each week, and had in fact rewritten the performance appraisals; with respect to the former, she complained only that "the follow and behavior change [sic] was not evident"; and she took issue with the rewritten performance reviews because Anderson had "delivered" them "without reviewing them with me"—a directive absent from the probationary notice. (Termination Notice, Ex. U to Appx.) With respect to supervising the sales floor, she wrote only that "[o]n the floor presence did not improve." (*Id.*) She did not address whether Anderson's attendance issues improved.

Anderson's performance reviews, probationary notice, and notice of termination all suggest that Follett evaluated and terminated Anderson based on vague and arguably subjective criteria. Readily quantifiable factors, such as the financial results of the Chicago State store and the specific tasks that Anderson was directed to complete—and did complete—appear to have been ignored. This does not, by itself, create an inference of race discrimination; but it does cast sufficient doubt on Follett's stated reason for terminating Anderson, especially in light of the lenient discipline shown to Holland and Pizarro, the unexplained gap between the April 2001 Warning and Anderson's June 2002 probation, the higher ratings given to white managers for inferior financial results, and the fact that Humanicki wanted to terminate Anderson even before placing him on probation. The cumulative effect of this evidence, the court concludes, is sufficient to establish pretext. Anderson's claims of race discrimination thus survive summary judgment.

### III. Retaliation

Anderson contends that Follett retaliated against him for complaining of race discrimination

to Jennie Ward Robinson and then to Audrey Southard in the summer of 2000,[38] shortly after his arrival at Chicago State. (Pl.'s Resp., at 11; Def.'s 56.1 ¶¶ 41-43.) Title VII prohibits an employer from discriminating against an employee because that employee has opposed any practice that Title VII deems unlawful. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004) (citing 42 U.S.C. § 2000e-3(a)). A plaintiff may establish a claim of retaliation in response to a defendant's motion for summary judgment under either the "direct" or the "indirect" method. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Under the direct method, the plaintiff must present evidence of: "(1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two." *Rhodes*, 359 F.3d at 508 (citing *Stone*, 281 F.3d at 644). Under the indirect method, a plaintiff must first establish a prima facie case of retaliation by showing that he: (1) engaged in a statutorily protected activity; (2) was performing his job in a satisfactory manner; (3) was subjected to adverse employment action; and (4) was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *See Rhodes*, 359 F.3d at 508 (citations omitted); *Stone*, 281 F.3d at 644. If the defendant can present a legitimate, non-invidious reason for the adverse employment action, the plaintiff must then rebut defendant's reason by showing that it is pretextual. *See Rhodes*, 359 F.3d at 508.

Anderson attempts to prove retaliation only under the direct method, as he argues in his brief that he engaged in statutorily protected activity, suffered adverse employment actions, and that there was a causal link between the two.[39] (Pl.'s Resp., at 10-12.) He makes no attempt to

---

[38] Anderson asserts, citing nothing, that he complained on July 25, 2000. (Pl.'s 56.1 Addnl. ¶ 19; Pl.'s Resp., at 7.) In his deposition, he testified only that he spoke to Robinson and Southard sometime between May and September 2000, most likely in June. (Pl.'s Dep., at 162.)

[39] After this argument, Anderson adds a section titled "Any Reasons for the Actions Presented by Defendant are Pretextual", (Pl.'s Resp., at 13), which discusses pretext only in the context of his claim that he was terminated because of his race.

establish the required elements of the "indirect method" of proving retaliation, nor does he cite any case that either cites those elements or that discusses the indirect method. Follett, for its part, cursorily dismisses Anderson's ability to proceed under the direct method, and devotes its briefs to contending that he cannot establish a prima facie case of retaliation under the indirect method.[40] (Def.'s Mem., at 11-14; Def.'s Reply, at 11-14.) The court thus analyzes Anderson's retaliation claim under both methods, and considers any of the parties' arguments that may be appropriate under either method.

## A. The Direct Method

Anderson contends that he engaged in statutorily protected activity when he "made informal complaints of racial discrimination" to Follett human resources employees Robinson and Southard shortly after his arrival at Chicago State in the summer of 2000.[41] Specifically, Anderson told Robinson, and then Southard, about Scholl's alleged comments during Anderson's tenure at the Virginia State bookstore; that he wanted to "get promoted higher" at Follett but that "there were not African-Americans in like certain positions"; that Humanicki had refused to grant his recent request for a two-week vacation; that his bookkeeper at the Roosevelt store had been terminated; that other managers had complained that they had not received their "just due"; and that he believed Durnil had discriminated against him during his tenure at the Roosevelt store, but that Steve Pribyl "didn't care." (Def.'s 56.1 ¶¶ 41, 43; Pl.'s Dep., at 163.)

Follett argues that these comments do not constitute statutorily protected activity because

---

[40]     Follett asserts that Anderson "ignores the well-settled standard used in the Seventh Circuit to show retaliation" because he does not cite the elements of the indirect method. (Def.'s Reply, at 11.) In fact, Anderson, a *pro se* plaintiff, correctly identifies and proceeds under the three elements of the direct method.

[41]     In his brief, Anderson explicitly disavows any claim that Follett retaliated against him for his complaints about Durnil's alleged racism during Anderson's tenure at Roosevelt in 1996. (Pl.'s Resp., at 11.) Such a claim would fail in any event: all of Anderson's claimed adverse employment actions did not occur until 2000, precluding a finding of causation; and Durnil, the person Anderson accuses of racist behavior, was not a Follett employee.

Anderson testified in his deposition that he did not believe at the time that he was making complaints of racial discrimination.  (Def.'s Reply, at 12.)  Thus, when asked, "When you were making these comments to Ms. Robinson, did you believe that you were making a complaint to someone at Follett?" Anderson responded, "No." (Pl.'s Dep., at 164.)  In response to the question, "So when you were talking to Audrey Southard, did you consider yourself making a complaint to Follett about discrimination?" Anderson answered, "No. I thought I was about to get terminated. I was terrified." (*Id.* at 166.)  When asked again, "So you didn't think you were making a complaint?" he answered, "No.  I thought I was about to get fired." (*Id.*)  In this court's view, when viewed in the light most favorable to to Anderson, this testimony is not inconsistent with his claim.  He tempered his "no" responses with an explanation of his fear that Southard was about to fire him; this suggests that what Anderson meant was that he did not label his comments as a "complaint" at the time because he was afraid to do so, and not necessarily that he did not believe that he was complaining about discrimination.

More importantly, even if Anderson testified that he did not believe that he was making a complaint—formal or informal—about race discrimination when he spoke to Robinson and/or Southard, this would not establish as a matter of law that Anderson had not engaged in statutorily protected expression.  A plaintiff engages in such expression if he "reasonably believe[s] in good faith that the practice [he] opposed violated Title VII." *Fine v. Ryan Intern. Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (quoting *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994)).  In *Fine*, the Seventh Circuit rejected an argument similar to that advanced by Follett here.  The *Fine* plaintiff, a female airline pilot, wrote to the airline's human resources manager, complaining of sexual harassment, insensitivity, and unequal treatment because of her sex; days later the airline fired her. *Id.* at 750-51.  Appealing the jury verdict in her favor, the defendant argued that the letter did not constitute statutorily protected expression because she testified in her deposition that she had experienced no incidents of sexual harassment in the period leading up to her termination.  *Id.*

at 753. The court affirmed the verdict, noting that the deposition testimony could have been used at trial to impeach the plaintiff, but did not preclude a finding that the letter reflected a good-faith, objectively reasonable belief that the defendant had engaged in discriminatory practices. *Id.*

Here, Anderson's comments addressed perceived discriminatory practices at Follett (no blacks in certain positions), and discrimination with regard to him personally (Pribyl's alleged disregard of Durnil's allegedly racist behavior). These comments, on their face, indicate that Anderson held a good-faith, reasonable belief that he was opposing conduct prohibited by Title VII. Moreover, regardless of whether Anderson believed he was making a (formal or informal) "complaint," Follett treated his comments as precisely that; indeed, the record shows that Southard informed Zawojski of Anderson's "potential complaints" and "complaints of racial discrimination." (Zawojski Dep., at 67, 114.) If Follett considered Anderson's comments as complaints of discrimination, and indeed retaliated against Anderson in response, then its behavior violated Title VII, regardless of how Anderson characterized the comments in his deposition. *See Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003) (noting that a typical retaliation claim involves a "complaint about discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity"). The court thus cannot agree that Anderson's comments to Robinson and Southard do not constitute statutorily protected expression.

Follett also makes much of the fact that Anderson never used the MR. HEAT hotline to complain about discrimination. (Def.'s Reply, at 13.) As noted, the hotline—whose acronym stands for "Honest Employees Against Theft"—does not appear to be designed to encourage complaints of discrimination. To the extent that it might provide an avenue for such complaints, the fact that the sign is posted in stores and encourages "employees" to complain about "management" suggests that the most likely scenario for a MR. HEAT discrimination complaint would involve a store employee complaining about a Store Manager like Anderson, rather than a Store Manager complaining about senior Follett management. In any event, Anderson's failure to use MR. HEAT

is irrelevant because he did complain of discrimination to Robinson and Southard.

Anderson's retaliation claim fails, however, under the remaining elements of the direct method. Although Follett concedes that his termination, and possibly his placement on performance probation, qualify as adverse employment actions, the fact that he was placed on probation in July 2002 and was terminated in September 2002, both approximately two years after his conversations with Robinson and Southard, defeats any effort to establish the requisite causal link. "A substantial time lapse between the protected activity and the adverse employment action is counter-evidence of any causal connection." *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (internal quotations and citation omitted). Two years is too long to support an inference that Anderson's probation or termination was causally related to his complaint. *See Haywood*, 323 F.3d at 532 (one year between time plaintiff complained and termination did not support inference of causation); *Filipovic*, 176 F.3d at 399 (four months negated causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) (termination five months after filing complaint, absent additional evidence, insufficient to allow inference of causation). Absent more evidence linking the events—and Anderson presents none—he cannot establish a prima facie case of retaliation under the direct method with regard to his probation or termination.

As noted, Anderson contends that he suffered many more adverse employment actions, including that he received "threatening" e-mails containing "character assassination"; that his store budgets were set higher than those of other managers; that Humanicki questioned Chicago State employees about him, made him redo his employees' performance appraisals, and had the store audited while Anderson was on vacation; that Christopher's letter containing the "Eileen" reference constituted "insult"; that he "was under constant surveillance" by Humanicki because she once visited the store three times in one week; and that Humanicki issued the April 2001 Warning. (Pl.'s Resp., at 5-7.) According to Anderson, all these actions were taken in response to his "informal complaint" of discrimination to Robinson and Southard. (*Id.* at 12.)

Although an adverse employment action is not limited to loss or reduction of pay or benefits, "'not everything that makes an employee unhappy is an actionable adverse action.'" *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court recently explained that the standard for what constitutes an adverse employment action in the retaliation context differs from the standard applied to charges of discrimination. Specifically, an adverse employment action for purposes of a Title VII retaliation claim "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2413. Thus, an employer can retaliate against an employee even by taking actions not directly related to employment. *Id.* at 2412. Nevertheless, to distinguish significant from trivial harms, the challenged action must be one that a reasonable employee would find "materially adverse." *Id.* at 2415. The court reasoned that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Adopting the standard formulated by the Seventh Circuit for determining materiality, the court held that the claimed retaliatory actions "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2409, 2411, 2415 (citing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).

Under these standards, none of the above complained-of actions amounts to an adverse employment action for Title VII purposes; and all suffer from the same causation problems as Anderson's probation and termination, for none occurred "on the heels" of his comments to Robinson and Southard. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). The e-mails he characterizes as "threatening," for example, merely inform him of tasks to complete or that he had failed to complete. The first such e-mail is a "store recap" of a Humanicki store visit on July 25, 2000; the date of the next cited e-mail, telling Anderson to "follow up and execute

markdowns," is November 28, 2000. (Pl.'s 56.1 Addnl. ¶ 19.) The bulk (twenty-five out of thirty) of Anderson's cited e-mails are dated on or after April 16, 2002, long after his conversations with Robinson and Southard. (*Id.*) The timing of the e-mails supports no inference of a causal link; and their content makes no reference to any complaint of discrimination. Similarly, nether the April 2001 Warning nor any of Anderson's performance appraisals constitute adverse employment actions. *See Stutler*, 263 F.3d at 703 (citing *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000)) ("Negative performance reviews . . . do not by themselves qualify" as adverse employment actions). In any event, those reviews occurred too long after Anderson's complaint in the summer of 2000. Likewise, to support his assertions of Humanicki's alleged "surveillance" and intrusions, as well as Christopher's "insult," Anderson cites to e-mails sent in the spring and summer of 2002, also long after his complaint. (Pl.'s 56.1 Addnl. ¶ 19.) And finally, the only evidence Anderson cites in support of his assertion of higher store budgets is the budgeted sales goals for other Store Managers, (*id.*); this creates no inference that Follett set higher goals for Anderson in response to his comments to Robinson and Southard.[42]

In sum, Anderson presents no evidence from which a reasonable fact-finder could infer that he suffered a materially adverse employment action as the result of complaining about discrimination. *See Stone*, 281 F.3d at 644. His retaliation claim therefore cannot survive summary judgment under the direct method.

### B.    Indirect Method

As noted, to proceed under the indirect method, Anderson must show that he: (1) engaged

---

[42]    Anderson mentions several other instances of alleged mistreatment in his LR 56.1 materials; specifically, he asserts that Humanicki denied him a two-week vacation, refused to permit him to stay in a hotel during company meetings in Oak Brook, and re-hired an employee over his objections. (Pl.'s 56.1 Resp. ¶ 58.) He does not pursue any retaliation claim relating to these incidents in his brief, however, and in the court's view, none of these allegations would amount to a materially adverse employment action; nor is there evidence of a causal link with Anderson's complaint, for Humanicki's denial of the vacation request occurred before Anderson's conversation with Southard and Robinson, and the record does not reveal the timing of the other events.

in a statutorily protected activity; (2) was performing his job in a satisfactory manner; (3) was subjected to adverse employment action; and (4) was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *See Rhodes*, 359 F.3d at 508 (citations omitted). As explained above, the court declines to adopt Follett's position that Anderson did not engage in protected activity. Assuming that Anderson can show that he was satisfactorily performing his job, as he established with respect to his discrimination claims, only his termination and possibly his probation qualify as adverse employment actions. Anderson makes no attempt, however, in the retaliation context, to identify similarly situated employees that did not engage in statutorily protected activity. As explained above, Tomalewicz represents a similarly situated employee for purposes of Anderson's discrimination claims because the two were cited for similar performance deficiencies, yet Anderson was terminated and Tomalewicz was not. This reasoning does not translate into the retaliation context, however, as Anderson does not address whether Tomalewicz, or any other Follett employee, engaged in any statutorily protected activity; indeed, as noted, he urges in his brief only the direct method of proving retaliation.

Moreover, although it is true that a plaintiff proceeding under the indirect method "need not show even an attenuated causal link[,]" *Stone*, 281 F.3d at 644, the time lapse between Anderson's complaints to Southard and Robinson in the summer of 2000 and his probation in June 2002, is simply too large to ignore. The court concludes that Follett is entitled to summary judgment on Anderson's retaliation claim.

## CONCLUSION

For the above reasons, Follett's motion for summary judgment (73) is granted with respect to Anderson's Title VII claim of retaliation, and denied with respect to Anderson's Title VII and § 1981 claims of race discrimination.

ENTER:

Dated: May 24, 2007

REBECCA R. PALLMEYER
United States District Judge